Robert GEIS and Loretta Geis,
Plaintiffs,

v.

BOARD OF EDUCATION OF PARSIPPANY–TROY HILLS, MORRIS COUNTY, Defendant.

Civ. A. No. 82–3373.

United States District Court,
D. New Jersey.

May 30, 1984.

Theodore A. Sussan, Spotswood, N.J., for plaintiffs.

Dillon, Bitar & Luther by Myles C. Morrison, III, Morristown, N.J., for defendant.

OPINION

DEBEVOISE, District Judge.

This action is brought pursuant to the Education for All Handicapped Children Act of 1975, 20 U.S.C. Section 1401, et seq., and, in particular, as provided by 20 U.S.C. Section 1415(e)(2). That section authorizes suit in the circumstances now present in the United States District Court by a party aggrieved by the findings and decision of a state educational agency concerning the identification, evaluation and educational placement of a handicapped child. In such an action the Court shall receive the records of the administrative proceedings, hear additional evidence at the request of a party and, basing its decision on the pre-

ponderance of the evidence, grant such relief as it determines is appropriate.

The central issue in the case is whether 15 year old S.G., a multiply handicapped child, should continue his education at The Woods School, a year-round residential facility for handicapped persons located in Langhorne, Pennsylvania or whether S.G. should be returned to his home and educated in either the Brooklawn Junior High School or a high school in Parsippany Troy-Hills.

The State has adopted regulations complying with federal standards governing the identification and placement of handicapped children. Under these regulations a local public school district must provide each handicapped pupil a special educational program and services according to how the pupil can best achieve educational success, N.J.A.C. 6:28–2.1(a). These regulations also require that a handicapped pupil shall be placed in the program option which is determined to be the least restrictive environment in view of the pupil's educational handicap, that every effort be made to place the pupil in an educational setting as close to his or her home as possible and that in selecting the least restrictive environment, consideration shall be given to any potentially harmful effect on the pupil or on the quality of services which the pupil needs, N.J.A.C. 6:28–2–2(b).

Plaintiffs are S.G.'s parents. The defendant is the Board of Education of Parsippany Troy-Hills, a local educational agency as defined by 20 U.S.C. Section 1401(8).

S.G., who was born on January 6, 1969, required considerable medical care during his first few years. He suffered from motor and psychomotor seizures for which he was given various medications until 1977.

In 1974 the Division of Youth and Family Services (hereinafter referred to as the "Division") assisted plaintiffs in placing S.G. in the Woods School. At the time plaintiffs lived in the Randolph School District. The District, as was required by the state regulations, prepared an individualized educational program (an "IEP") for S.G. which recommended generally that he be placed in a "residential setting to provide constant and consistent supervision and attention to the medical, physical and educational disabilities of this child." Placement in the Woods School was approved. The Division paid for the residential portion of the expenses, with plaintiffs contributing at first $312 and later $450 per month, and the school district paid for the educational component.

Plaintiffs moved to Parsippany Troy-Hills and thereupon their son's evaluation and placement became the responsibility of the child study team of the elementary school serving plaintiffs' neighborhood. Each year until 1981 the team recommended S.G.'s continued placement at the Woods School.

In either 1980 or 1981 the Division undertook proceedings to terminate any obligation it had to pay for S.G.'s residential expenses at the Woods School. At about the same time, S.G., because of his age, became subject to the jurisdiction of the child study team of the Brooklawn Junior High School. Plaintiffs learned that the child study team intended to recommend that S.G. be removed from the Woods School.

On June 24, 1981 plaintiffs requested a due process hearing pursuant to N.J.A.C. 6:28–1.9, and such a hearing was held on September 21, 1981. It was ordered that the Brooklawn School child study team conduct an evaluation of S.G. to determine what placement was educationally appropriate for him. Members of the child study team went to the Wood School and observed and evaluated S.G., and in November 1981, classified S.G. as "Multiply Handicapped with Primary Trainable Mentally Retarded and Secondary Neurologically Impaired." The child study team determined that continued residential placement was not necessary to enable S.G. to receive the education to which he is entitled by law and recommended placement in the district's Brooklawn School THR program.

The plaintiffs, believing that the residential placement was necessary for S.G. to continue making progress, asked for a hearing on this recommendation. Accordingly, a hearing was held before Classification Officer W. Donald Clark of the New Jersey Department of Education on April 28, May 27 and June 23, 1982. After hearing the testimony of the plaintiffs and of their expert psychologist, as well as that of the Board's Director of Special Services, learning disabilities teacher-consultant, school psychologist, speech therapist and social worker, the Classification Officer issued his decision upholding the determination of the child study team and ordering that S.G. be returned to the Brooklawn School. In reaching the decision, the Classification Officer held that:

"It is clear that S.G. requires a structured specialized program with major assistance in the development of communication skills. It is also concluded, on the basis of testimony by respondent's experts, that he can be given such a program in the Brooklawn Junior High TMR class. It has not been established that S.G. requires a 24 hour residential placement in order to learn. He is apparently capable of learning and progressing educationally in the day program while residing at home as do many other TMR children with complicating handicaps in addition to their retardation. With regard to classification, the current classification by respondent's child study team (R-8) which indicates MH with primary TMR and secondary NI was not shown to be inappropriate by petitioners. The classification officer finds that the present classification shall stand with regard to S.G. and that S.G. shall be placed in the Brooklawn Junior High TMR class beginning with the opening of school in September of 1982."

It is this determination from which plaintiffs have filed the instant appeal.

I have reviewed the transcripts of the proceedings before the Classification Officer and have reviewed the various reports, recommendations and other exhibits admitted in evidence at the trial of the case. In addition, I heard the testimony of the following persons: Susan Lilley O'Connor, a social worker at the Wood School, the plaintiffs, Dr. Vincent Aniello, Coordinator of Pupil Personnel Services of the Parsippany Troy-Hills school system, Eugene Neiditch, principal of the Brooklawn Junior High School, John Zaffiro, school psychologist at the Parsippany Troy-Hills school system, Andrea M. Randel, Director of the Department for Communication Disorders at the Morristown Memorial Hospital, and Janet Groulich, a teacher of the hearing impaired and handicapped children at the Parsippany Troy-Hills school system.

On May 16 I attended the TMR class at the Brooklawn Junior High School and at one of the high schools of Parsippany Troy-Hills. On May 17 I visited S.G.'s residential house at the Woods School and attended the opening session of his classes.

If the standard of review in this case were a determination whether the decision of the hearing officer was supported by substantial evidence, his decision would be sustained. However, under 20 U.S.C. Section 1415(e)(2) I must make an independent determination of the appropriateness of the placement of the student, e.g., *Age v. Bullitt County Public Schools*, 673 F.2d 141 (6th Cir.1982). In doing this I must give due weight to the administrative proceedings which have taken place in the New Jersey educational system. *Hendrick Hudson District Board of Education v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982).

There is no substantial disagreement concerning S.G.'s condition and stage of development. He is a trainable, mentally retarded child with neurological impairment, with major language difficulties and can communicate by voice only through a few sounds and words. He is learning sign language and must develop that ability if he is to be able to function in a sheltered workroom or other noninstitutional setting.

Socially he gets along well with his peers and with adults, but lacks initiative or aggressiveness. Through the sustained ef-

forts of the school, he is gaining in his ability to assert himself.

He has made significant progress at the Woods School both in learning elementary academic skills, such as identifying numbers and letters and certain words. He is now living in a residential house with 40 other boys of his age. He takes care of his personal needs, performs chores, takes trips with others. He visits his home on occasional weekends and for periods up to two weeks four times a year.

None of the persons who testified disagreed with the conclusion that S.G. needs a carefully structured program and that he will never be able to live or work outside of such a structure. Each professional witness who evaluated the situation is of the opinion that the best that can be expected is that S.G. can develop to a point where he can perform a very simple task in a sheltered workshop kind of environment and where he can live in some structured environment such as a group home for handicapped adults.

Two educational programs are presently available for S.G. One is to continue the education at the Woods School. The other is to return him to his home where he can attend the TMR classes in the Parsippany Troy-Hills school system.

The first issue is what standard is to be applied in deciding between these two alternatives.

The federal Act requires that in order to qualify for federal aid a State must demonstrate that it has in effect a policy that assures all handicapped children the right to a free and appropriate public education, 20 U.S.C. Section 1412(1). What constitutes an appropriate public education was considered in *Hendrick Hudson District Board of Education v. Rowley, supra.* In *Hendrick* the Supreme Court stated that:

> The District Court and the Court of Appeals thus erred when they held the Act requires New York to maximize the potential that of each handicapped child commensurate with the opportunity provided nonhandicapped children. Desirable though that goal might be, it is not the standard that Congress imposed upon states which receive funding under the Act. Rather, Congress sought primarily to identify and evaluate handicapped children and to provide them with access to a free public education. Implicit in the Congressional purpose of providing access to a "free appropriate public education" is the requirement that the education to which access is provided be sufficient to confer some educational benefit upon the handicapped child. It would do little good for Congress to spend millions of dollars in providing access to a public education only to have the handicapped child receive no benefit from that education. The statutory definition of "free appropriate public education," in addition to requiring the state to provide each child with "specially designed instruction," expressly requires the provision of "such ... supportive services as may be required to assist a handicapped child to benefit from special Education, Section 1401(17) (Emphasis added). We therefore conclude that the "basic floor of opportunity" provided by the Act consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child. At page 200, 102 S.Ct. at page 3048.

I conclude that the program which Parsippany Troy-Hills proposes meets that floor established by Congress. However, New Jersey's own program goes beyond the minimum established by Congress. It creates considerably higher standards. Under N.J.A.C. 6:28–2.1 and 2.2 a local public school district must provide each handicapped pupil a special education program and services according to how the pupil can *best* achieve educational success. A handicapped pupil must be placed in the program option which is determined to be the least restrictive environment in view of the pupil's educational handicap and every effort must be made to place the pupil in an educational setting as close to his or her home as possible. In selecting the least restrictive environment, consideration shall

be given to any potential harmful effect on the pupil or on the quality of services which the pupil needs. Plaintiffs assert that attendance at the Woods School will best enable S.G. to best achieve educational success and constitutes the least restrictive environment consistent with that goal. Defendant Board, on the other hand, urges that these ends will best be served by S.G.'s return home and attendance at his local school.

Having heard the testimony, reviewed the exhibits and visited the two educational programs and having considered with great care the findings and conclusions of the educational authorities of the state, I can state with some degree of assurance that each program is excellent, perhaps a model of its kind.

I observed formal classroom sessions of both. They have little to distinguish them. Essentially the same subject matter was being taught. The same methods were used. Each had five or six students. The teachers were warm and friendly, having an easy relationship with their pupils. In both the high school class and in the Woods School class there was one student who, on the particular day I was present, was withdrawn from the activities going on around him or her. All the other students participated fully with interest and enthusiasm accepting the noninvolvement of their classmate as a natural event of the day. Each group had trips and athletic events planned. Insofar as the period from 8:30 to 3:00 p.m. of each school day was concerned, there is little to distinguish the two programs. It may be that the Woods School has in residence a larger number of specialists, but specialists are available at the Parsippany Troy-Hills school system and I'm confident that they would be utilized where necessary.

The two programs differ when it comes to the activities taking place after 3:00 p.m. each day and on weekends and summer vacations.

During those times Parsippany Troy-Hills depends on other resources to provide the structure and services which handicapped persons require—parents, community services, day camps for the handicapped and the like. At the Woods School, the school itself continues to provide the structure, which can be adapted as a person develops increasing skills and social abilities. There are different gradations of residential houses. There are increasing degrees of independence—from walking with a friend through the very extensive campus of the school to going with a friend to the stores or other facilities in the nearby town.

It was the Board of Education's position based on the opinions of some of its experts that S.G. should be brought back into a home and school setting, because there is a danger that S.G. will develop a dependence on an institution and will never be able to move out of it. It is plaintiffs' position, supported by their professional witnesses, that S.G.'s continued progress depends upon the concentrated form of education provided by a residential school such as the Wood School, and that he would be unable to cope with the substantial amounts of unstructured time.

Thus the experts, all of whom are sincere and competent, disagree. I have evaluated the experts' opinions, the reasons given for them and the other evidence in the case and conclude that plaintiffs have established by a preponderance of the evidence that continued attendance at the Wood School will enable S.G. to best achieve success in learning and that placing S.G. in his home and in local schools would have an adverse effect on his ability to learn and develop to the maximum possible extent.

I have reached this conclusion based on a number of items in evidence.

1. There is testimony of all persons having knowledge of the steady progress S.G. has made at the Woods School and his ability to communicate, his mastery of numbers, some letters and other basic subjects and his ability to live more effectively with other people.

2. There is testimony of S.G.'s parents that S.G. was regressing after he had been

home for approximately a week. There is also the testimony of Barbara Thompson, defendant's learning disabilities consultant teacher, before the Classification Officer. She recognized that S.G. might regress during the times he was not attending the Brooklawn School program, lacking the structure of interaction with other persons. "He would probably become very listless and—how can I describe it? You know, there just wouldn't be communication. He would miss out". Transcript of May 27, 1982 at page 123. This would not pertain during periods when he was in attendance at the Parsippany Troy-Hills schools, or engaging in school or community-sponsored activity for the handicapped, but inevitably there would be long periods after school or on weekends and during the summer when he would lack the stimulation and incentive to learning provided by the Woods School. His parents, his brother and sisters will undoubtedly take up some of the slack, but the parents work and the other children, who are 20, 19 and 17 years of age, respectively, are either at college or soon will go to college.

3. There was testimony before the Educational Classification Officer by Dr. Rhonda Rapps, a child psychologist, who is an independent consultant retained by plaintiffs. She stated that S.G. needs continuing work on his ability to communicate with signs and that he should be with people who can reinforce these skills and with other children generally. This same witness testified that his education must consist of more than a five or six hour segment of each day. It must be followed through during the rest of his waking hours. This, of course, is true of any child. His or her learning and growth continues during the many hours when he or she is out of school. However, for most children the process takes place naturally and spontaneously. There is no need to provide a special environment for development to occur.

4. The Woods School social worker, Susan Lilley O'Connor, testified that in her opinion if S.G. were placed in a special class in the Parsippany Troy-Hills school

system he would be "devastated" by the hub bub involved in functioning within the climate of a bustling junior or senior high school. Based on her experience with S.G. she believes change is very hard for him and that his study progress would be reversed and that he would become withdrawn.

I doubt that S.G. would be devastated by the environment which I saw at the Brooklawn School where young and seriously handicapped people moved comfortably and happily through the school as they went from one activity to another. However, other evidence supports Ms. O'Connor's opinion that S.G.'s progress would be slowed and that the overall drastic change might cause him to retrogress and become withdrawn.

5. Exhibit P–2 contains an October 26, 1981 psychiatric report of William T. Doherty, M.D. He apparently was retained by the child study team to evaluate S.G. He observed, among other things, that "Unfortunately S.G. is lacking in communication skills which would make any transition most difficult for him." He also stated that S.G. "would have serious difficulty handling a challenging and complicated environment in which there is much interaction with others."

6. Defendant's school psychologist, John Zaffiro, while advocating S.G.'s return to his home and the Parsippany Troy-Hills schools, candidly recognized that there are risks involved in the change proposed by defendant. This would seem to be particularly true at a time when S.G. is confronted with the usual turbulence of adolescence.

7. All the witnesses agreed that S.G. will never reach a level of development at which he can live independently. All agree that the highest obtainable objective for him is to achieve a level development where he could work at a simple task in a controlled environment such as a sheltered workshop and where he can live in a structured residence such as an adult home for handicapped people. The legal realities dic-

tate that Parsippany Troy-Hill's responsibilities for S.G. will end when he becomes 21. The economic realities dictate that the Woods School's responsibility for S.G. will end when he attains that age. Thus the goal of each institution must be to enable him to achieve this highest obtainable level of development by the time he becomes 21.

8. Andrea Randel, Director of the Department of Communication Disorders of the Morristown Memorial Hospital examined S.G. in January, 1983. She concluded that by reason of muscular weakness and his other disorders he has expressive language skills at the level of a one and one half to two year old child. She also concluded that he can go no further in developing oral skills and must emphasize the development of sign language.

When combining sign language with such oral communication abilities as he possesses, he should be able to become functional. It was Ms. Randel's opinion that sign language should be learned not only in the classroom and during formal speech therapy sessions, but also by associating with peers and others who use sign language at all other times of the day. This S.G. could obtain to a maximum extent at a residential school and to a much lesser extent at home. The danger is that if S.G. did not have peers who use sign language to communicate with him, he would abandon his efforts to master these skills and would lose the skills that he has already developed.

9. The Woods School's program is not designed to encourage S.G.'s permanent institutionalization. Its program generally pushes each resident towards his or her next level of development with the aim of sending the person out into the community to the greatest extent feasible.

On the basis of this evidence I conclude that New Jersey's regulation implementing the mandates of the Federal Education for All Handicapped Children Act requires that S.G. continue to be educated at the Woods School.

I would request that plaintiffs' attorney prepare an order implementing this decision.