GEIS, Robert and Loretta Geis

v.

BOARD OF EDUCATION OF PARSIPPANY–TROY HILLS, MORRIS COUNTY, Appellant.

No. 84–5482.

United States Court of Appeals,
Third Circuit.

Argued March 20, 1985.

Decided Sept. 30, 1985.

Myles C. Morrison, III (Argued), Maryann L. Nergaard, Dillon, Bitar & Luther, Morristown, N.J., for appellant.

Theodore A. Sussan (Argued), Spotswood, N.J., for appellees.

Before SEITZ and HIGGINBOTHAM, Circuit Judges and WEBER, District Judge.*

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

In this appeal we review the appropriateness of the educational placement of a mentally and neurologically impaired child, pursuant to the Education of the Handicapped Act ("Act"), 20 U.S.C. §§ 1400–1461 (1982). The Board of Education of Parsippany-Troy Hills, Morris County, New Jersey ("Board") appeals from the district court's final order requiring that the child, S.G., continue in a residential program at the Woods School in Langhorne, Pennsylvania. The Board was also ordered to pay S.G.'s educational costs. For the reasons that follow, we will affirm the judgment of the district court.

## I.

Because this case involves interpretation of a complex web of federal and state statutes and regulations, it will be helpful to first summarize the legal framework. The Act provides federal money to assist state and local agencies in educating handicapped children, conditioned on compliance with certain mandatory goals and procedures. The Act thus represents a federal effort to foster the education of handicapped children through cooperative federalism. It was passed in response to Congress' perception that a majority of handicapped children in the United States "were

either totally excluded from schools or [were] sitting idly in regular classrooms awaiting the time when they were old enough to 'drop out.'" H.Rep. No. 332, 94th Cong., 1st Sess. 2 (1975).

An important goal of the Act is to reduce costs to government and taxpayers by helping handicapped people to become self-sufficient. As we have previously noted:

A cost-benefit philosophy supported these interlocking goals. Instead of saddling public agencies and taxpayers with the enormous expenditures necessary to maintain the handicapped as lifelong dependents in a minimally acceptable institutionalized existence, Congress reasoned that the early injection of federal money and provision of educational services would remove this burden by creating productive citizens.

*Kruelle v. New Castle County School District*, 642 F.2d 687, 691 (3d Cir.1981) (footnote omitted).

To qualify for federal financial assistance under the Act, a state must demonstrate that it "has in effect a policy that assures all handicapped children the right to a free appropriate public education." 20 U.S.C. § 1412(1). That policy must be defined in a state plan submitted to, and approved by, the Secretary of Education, which must describe in detail the goals, programs, and timetables under which the state intends to educate handicapped children within its borders. 20 U.S.C. § 1413.

The "free appropriate public education" required by the Act is tailored to the unique needs of the handicapped child by means of an "individualized education program" ("IEP"). 20 U.S.C. § 1414(a)(5). The IEP, which is the product of a meeting between qualified representatives of the local education agency, the pupil's teachers, and parents or guardians, is a written document containing:

(A) a statement of the present levels of educational performance of the child, (B)

---

* Honorable Gerald J. Weber, United States District Court for the Western District of Pennsyl- vania, sitting by designation.

a statement of annual goals, including short-term instructional objectives, (C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs, (D) the projected date for initiation and anticipated duration of such services, and (E) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.

20 U.S.C. § 1401(19).

The Act also imposes extensive procedural safeguards upon the states, including provisions for notice to the parents of any proposed change in a child's placement, the right to a "due process" hearing before an impartial officer regarding any changes in the child's placement, the right of appeal to the designated state educational agency when due process hearings are conducted by local agencies, and further appeal to any state court of competent jurisdiction or federal district court. No changes in placement may be made during the pendency of those proceedings. 20 U.S.C. § 1415.

In New Jersey, the Act's mandates are implemented by an array of statutes, N.J. Stat.Ann. §§ 18A:46–1—18A:46–46 (West 1968 & Supp.1985), and regulations promulgated by the State Board of Education under its "broad legislative rule-making powers." *D.S. v. Board of Education*, 188 N.J.Super. 592, 598, 458 A.2d 129, 133, *certification denied*, 94 N.J. 529, 468 A.2d 184 (1983). The initial evaluation and classification of a child is conducted by a multidisciplinary "child study team", which then develops an IEP in consultation with parents and teachers. N.J.Admin.Code tit. 6, §§ 6:28–3.1—6.28–3.6 (1984). Upon receiving written notice of a proposed or denied action, parents have 30 days to request a due process hearing. *Id.* at § 6.28–2.7. Until recently, due process hearings were conducted by Classification Officers who were employees of the State Board of Education. N.J.Admin.Code tit. 6, § 6:28–1.-9(j)(1) (1978). In *East Brunswick Board of*

*Education v. New Jersey State Board of Education*, No. 81–3600 (D.N.J. July 7, 1982), however, this procedure was struck down as violative of the Act's requirement that due process hearing officers be independent of the State educational agency. 20 U.S.C. § 1415(b)(2). On March 21, 1983 new regulations transferring responsibility for due process hearings to the independent New Jersey Office of Administrative Law went into effect. *See* 15 N.J.Admin. Reg. 437 (1983); N.J.Admin.Code tit. 1, chap. 6A (1984); N.J.Admin.Code tit. 6, § 6:28–2.7(a)(6) (1984).

**II.**

S.G., who is now sixteen years old, has been a resident pupil at the Woods School since 1974. At that time, the appellees lived in Randolph Township, New Jersey, where S.G. had previously attended preschool classes for the handicapped. Upon evaluation of S.G. for enrollment in the school system, the child study team for the Randolph School district recommended residential educational placement and described S.G. as suffering from neurological dysfunction, mental retardation, communication disorders, and chronic illness with emotional overtones. During his early years, S.G. also suffered from motor and psychomotor seizures for which he took medication until 1977.

In 1977, the appellees moved to Parsippany, New Jersey. The Parsippany-Troy Hills Regional School District and the Board thus took responsibility for S.G.'s educational placement. The Board evaluated S.G.'s condition in 1977 and 1979 and recommended that he remain in his residential placement at the Woods School. In 1981, however, the appellees learned that the Board's child study team intended to recommend that S.G. enter public school in Parsippany. They contested the change in placement and, on June 24, 1981, they requested a due process hearing.

Pursuant to an order of the Classification Officer, entered September 28, 1981, the child study team reevaluated S.G. and recommended that he attend the Brook-

lawn Junior High School. The appellees again objected and additional hearings were held on April 28, May 27, and June 23, 1982. In his September 13, 1982 decision, the hearing officer found that, until the current dispute, the Board regarded S.G.'s placement at the Wood's School as "officially and educationally necessary." App. at 43. Nonetheless, the officer decided that the child study team's evaluation was correct and ordered S.G. to be placed at the Brooklawn Junior High School's class for students with trainable mental retardation beginning with the 1982–83 school year.

Though the *East Brunswick* decision, *supra,* that invalidated the New Jersey due process hearing procedure was issued prior to the Classification Officer's decision in this case, the parties agreed to treat his forthcoming opinion as the impartial final decision in the administrative proceedings, and the appellees appealed this decision to the district court pursuant to 20 U.S.C. § 1415(e)(2).[1]

The district court held a trial in this case on May 15 and 22, 1984. The court reviewed the evidence in the administrative record and heard new testimony about S.G.'s evaluation in 1981 and his progress since the administrative decision. The district judge also visited both schools to see their educational programs.

In its opinion filed May 30, 1984, the district court held that the New Jersey regulations which implemented the Act created a higher standard for the education of handicapped children than the basic opportunity required in order to receive federal funding. Specifically, the court held that under N.J.Admin.Code §§ 6:28–2.1 and 2.2 (1978) "a local public school district must provide each handicapped pupil a special education program and services according

to how the pupil can *best* achieve educational success." *Geis v. Board of Education,* 589 F.Supp. 269, 272 (D.N.J.1984) (emphasis added). The district court found by a preponderance of the evidence that the Woods School would allow S.G. to "best achieve success in learning and that placing S.G. in his home and in local schools would have an adverse effect on his ability to learn and develop to the maximum possible extent." 589 F.Supp. at 273. On June 1, 1984, the district court entered its final order permitting S.G. to continue his education at the Woods School. The court also directed the Board to pay for S.G.'s educational fees, including tuition, room and board, and related expenses, and to reimburse the appellees for certain fees they had paid in the past. This appeal followed.

### III.

We turn now to the threshold question of whether the district court had jurisdiction to enforce against the Board a state-mandated standard of educational opportunity that is more demanding than the basic floor of opportunity required by the federal Act. (We assume for purposes of this jurisdictional discussion that the state standard is indeed higher.) The Board contends that the district court's order violates the eleventh amendment, in that it, in effect, orders the state to comply with state law. *See Pennhurst State School & Hospital v. Halderman, ("Pennhurst II"),* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Appellees counter that any *Pennhurst II* problem is obviated by the fact that the state standard is incorporated into federal law. To resolve this issue we must, very briefly, review the eleventh amendment jurisprudence and the holding of *Pennhurst II.*

The eleventh amendment provides:

---

1. At the time of the Classification Officer's decision, New Jersey regulations provided that persons aggrieved by a determination of a Classification Officer could appeal in turn to the Commissioner of Education and to the State Board of Education. N.J.Admin.Code tit. 6, § 6:28–1.-9(j)(8–9) (1978). Appellees did not exhaust these avenues of appeal. However, as the Board concedes, such exhaustion would in all

probability have been fruitless in light of the fact that New Jersey's procedures were struck down in the *East Brunswick* decision, and new regulations giving the New Jersey Office of Administrative Law authority to conduct due process hearings were not effective until March 21, 1983, nearly six months after this suit was commenced.

**580**

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

 It is well-settled, as a matter of judicial construction, that despite its limited and seemingly unambiguous language, the eleventh amendment constitutionalizes a much more far-reaching principle of state sovereign immunity. *See generally* Shapiro, *Wrong Turns: The Eleventh Amendment and the Pennhurst Case*, 98 Harv.L. Rev. 61 (1984); Gibbons, *The Eleventh Amendment and State Sovereign Immunity: A Reinterpretation*, 83 Colum.L. Rev. 1889 (1983). Thus, in *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), the Supreme Court held that the eleventh amendment prohibits a federal court from hearing a suit brought against a state by *its own* citizens, absent the state's consent. Where a state agency or department is named as defendant, that too is considered a suit against a state which is barred by the eleventh amendment. *See Florida Department of Health and Rehabilitative Services v. Florida Nursing Home Association*, 450 U.S. 147, 101 S.Ct. 1032, 67 L.Ed.2d 132 (1981). Generally, a local school district that has authority to issue bonds and raise revenue through taxation, and is not defined by state law to be a state agency, is not entitled to the eleventh amendment's cloak of sovereign immunity. *See Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). The Board, however, argues that in the context of special education in New Jersey, local school boards act as nothing more than agencies of the State implementing its policies. Without so deciding, we will assume that the Board is an agency of the State.

 The rule of sovereign immunity is subject to an exception of vast import: where a suit seeks relief against a state agency for action contrary "to the supreme authority of the United States", it is not deemed a suit against the sovereign. *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). This so-called "stripping doctrine" has been limited to suits for prospective injunctive relief; the federal courts have no jurisdiction to award retroactive monetary relief in such cases. *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

In *Pennhurst II* the Supreme Court confronted another variation on the *Ex parte Young* theme—a pendent claim against state agencies and officers seeking prospective injunctive relief for a violation of *state* law. The Court held that such suits were barred by the eleventh amendment:

> In such a case the entire basis for the doctrine of *Young* and *Edelman* disappears. A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment.

465 U.S. at ——, 104 S.Ct. at 911.

In applying the doctrine of *Pennhurst II* to the present case, our recent decision in *Everett v. Schramm*, 772 F.2d 1114 (3d Cir.1985) is instructive. *Everett* involved a dispute between recipients of Aid to Families With Dependent Children ("AFDC") and the State of Delaware over the proper "standard of need" [2] to be used in certain AFDC calculations. The State was using a standard that, it was conceded, met the minimum requirements of federal law. The plaintiffs contended that *state* law established a much higher standard, and they sought an injunction that would require that the State use the higher standard. Delaware argued that such relief would be

---

**2.** States participating in AFDC are required to establish a set of dollar figures considered adequate to provide for the subsistence of households of various sizes. *Everett,* at 1115.

prohibited under *Pennhurst II*. We rejected this contention:

> Where, as here, federal law incorporates by reference requirements established by state law, the federal supremacy rationale underlying *Ex parte Young* applies with equal force. *See Students of California School for the Blind v. Honig*, 736 F.2d 538 (9th Cir.1984), *vacated on other grounds*, [——] U.S. [——], 105 S.Ct. 1820 [85 L.Ed.2d 114] (1985). To hold otherwise would seriously undermine the national government's role in programs based on cooperative federalism. "To put the matter more bluntly, where a state violates federal law, it is no better off because it also violates its own law." *Louise B. v. Coluatti*, 606 F.2d 392, 399 (3d Cir.1979).

At 1119.

The parallels between the standard of need under AFDC and the standard of educational opportunity under the Act are strong, and we believe that *Everett* is controlling here. In each program the states are given considerable latitude in establishing the applicable standards, subject to a floor mandated by federal law. In each case, however, the federal government retains considerable authority to enforce the standards thus established. We think it very unlikely that Congress, in granting state and federal courts concurrent jurisdiction to enforce the Act, 20 U.S.C. § 1415(e)(2), envisioned that the standard of educational opportunity to be applied would depend on the forum. If that were the case, school districts could easily evade higher state standards by the expedient of removing cases to federal court.

■ Moreover, we find that the incorporation of state standards is explicit in the Act. As noted by the Ninth Circuit in *Honig, supra* —upon which we relied in *Everett* —a "free appropriate public education" is defined under the Act as special education and related services that, *inter alia*, "meet the standards of the state educational agency." 20 U.S.C. § 1401(18)(B). In *Honig* this was held to include the California standards for seismic safety of schools. 736 F.2d at 545. We think it even more clearly applies to a state's own standard of educational opportunity for handicapped children. *See Town of Burlington v. Department of Education*, 736 F.2d 773, 788–89 (1st Cir.1984), *aff'd*, —— U.S. ——, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). By this catchall provision, federal law incorporates any state standards that go beyond the minimum standards of the Act, and thereby confers on the federal courts authority to enforce such standards under their "federal question" jurisdiction, 28 U.S.C. § 1331. We therefore hold that *Pennhurst II*, which involved enforcement of state law under the doctrine of pendent jurisdiction, does not bar the relief awarded by the district court.

## IV.

The Supreme Court considered the meaning of the statutory term "free appropriate public education" in *Hendrick Hudson Central School District Board of Education v. Rowley*, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982):

> Congress sought primarily to identify and evaluate handicapped children, and to provide them with access to a free public education.
>
> Implicit in the congressional purpose of providing access to a "free appropriate public education" is the requirement that the education to which access is provided be sufficient to confer some educational benefit upon the handicapped child. It would do little good for Congress to spend millions of dollars in providing access to a public education only to have the handicapped child receive no benefit from that education.... We therefore conclude that the "basic floor of opportunity" provided by the Act consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child.

458 U.S. at 200–01, 102 S.Ct. at 3048.

The district court specifically found that the IEP proposed by the Board meets the floor established by Congress. Indeed, the

court found that the Parsippany-Troy Hills TMR program, like the Woods School, was "excellent, perhaps a model of its kind." 589 F.Supp. at 273. The district court based its decision that S.G. should nonetheless remain in residence at the Woods School on a provision of the New Jersey Administrative Code which required that handicapped pupils be provided a special education program and related services "according to how the pupil can *best* achieve success in learning. . . ." N.J.Admin.Code tit. 6, § 6:28–2.1 (1978) (emphasis added).[3] The Board contends that the district court erred in concluding that New Jersey imposed a higher standard of special education than the floor mandated by the federal Act.

 The Board does not argue that the district court's holding was inconsistent with the plain language of former § 6:28–2.1. Rather, the Board seeks to minimize the import of that language. They first argue that it is inconsistent with the New Jersey legislature's mandate, as found in N.J.Stat.Ann. § 18A:46–13 (West 1968):

> It shall be the duty of each board of education to provide suitable facilities and programs of education for all the children who are classified as handicapped. . . .

The Board emphasizes the word "suitable", arguing that it is essentially equivalent to the term "appropriate" in the federal Act, thus evincing a legislative intent that the federal standard be applied in New Jersey. But even if the New Jersey statute had used the word "appropriate", we would not be persuaded that it prevents the State Board of Education from imposing a standard higher than the "some benefit" standard of *Rowley*.[4] Both "appropriate" and "suitable" are vague terms that must be given content by administrative and judicial interpretation. We do not see any statu-

tory impediment to the State Board of Education concluding that an "appropriate" or "suitable" educational program is one that best helps a pupil to achieve success in learning. Indeed, as appellees point out, the legislative findings and determination section of the New Jersey law envisions such a standard:

> The Legislature hereby finds and determines that the security and welfare of the State require that all school-age children be assured *the fullest possible opportunity to develop their intellectual capacities.* In order to achieve this objective it is the intent of this Legislature to require that the State and local communities identify and provide remedial services for handicapped children in both public and nonpublic schools.

N.J.Stat.Ann. § 18A:46–19.1 (West Supp. 1985) (emphasis added).

 The Board further argues that the "best achieve success" standard cannot be read literally, but rather must be read in light of the mandated preferences for "mainstreaming" (i.e., educating handicapped children with non-handicapped children), 20 U.S.C. § 1412(5)(B), and for placing handicapped children in "the least restrictive environment." N.J.Admin.Code tit. 6, § 6:28–2.2 (1978). We agree that the Act and New Jersey's implementing statutes and regulations contain a number of goals which may at times come into tension to some extent, *see also Kruelle*, 642 F.2d at 695, but we do not believe that fact prevents a state from setting its educational goal higher than the *Rowley* "some benefit" standard. In the instant case, for example, it does not seem to us that pursuit of a placement that will enable S.G. to best achieve success in learning must necessarily sacrifice the other statutory goals. There is no issue of mainstreaming here;

3. The "Special Education" chapter of the New Jersey Administrative Code was extensively overhauled shortly after the district court's decision. *See* 16 N.J.Admin.Reg. 1970(a) (1984). The present regulations contain nothing comparable to the "best achieve success" standard. We, of course, intimate no view as to the signifi-

cance of this or any other regulatory changes in future consideration of S.G.'s placement.

4. We also note that the New Jersey statute cited predated the federal Act by more than 20 years, making it very doubtful that the language was chosen to conform to the Act.

both the residential placement and the TMR class are non-mainstream programs. As to the requirement that handicapped children be placed in the least restrictive environment possible, we believe that this determination must include consideration of the particular handicap a student has. The regulations in effect at the time of the Classification Officer's decision specifically provided that a pupil was to be placed in "the least restrictive environment *in view of the pupil's particular educational handicap*." N.J.Admin.Code tit. 6, § 6:28–2.2 (1978) (emphasis added). Current regulations make it even more clear that the goal of placing children in the least restrictive environment does not trump all other considerations: "Such a setting [the least restrictive environment] is selected in light of a pupil's special education needs." N.J. Admin.Code tit. 6, § 6:28–1.3 (1984). For some pupils a residential placement may very well be the least restrictive. Considering S.G.'s language problems, for example, the district court could conclude that a residential placement where sign language is used is the least restrictive environment.

Finally, the Board argues that it is absurd to read the term "best" literally, as

[t]here will always be a private program somewhere that for some increased amount of tuition can offer more facilities, more instructional personnel and more services than a given public school district can offer. It is even possible that there presently exists another private school which would offer more programs and more communications instruction for S.G. than does the Woods School, another school which would, therefore, better permit him to achieve educational success. Would this mean that S.G. must be sent to that school even though the Woods School would be appropriate? The Appellant submits that this is the logical extension of the trial court's reading of [§ 6:28–2.1].

Appellant's Brief at 12–13.

The record before us certainly does not support the notion that there are "always" superior private programs available for handicapped children, and we are not prepared to take judicial notice of such a dubious proposition. Even if it were true, it is not clear to us that the logic of the district court must extend beyond what is feasible or reasonably cost-effective. It is clear, given S.G.'s longstanding placement at the Woods School, that the program at issue is viewed as feasible and prudent. Thus, we need not go down the Board's hypothetical slippery slope.

We hold that the district court did not err in concluding that New Jersey imposes a higher standard of special education than that required by the Act. We take note that both parties have submitted to us unpublished decisions of independent New Jersey Administrative Law Judges which, they contend, support their respective interpretations of former § 6:28–2.1. These submissions reflect neither binding precedent nor a consistent interpretation by the agency that promulgated the regulation, and thus have not influenced our decision today.

## V.

■■■ Finally, the Board contends that even if New Jersey imposes a higher standard of special education than that required by federal law, the district court erred in finding that S.G. would better achieve educational success at the Woods School than at the Brooklawn TMR program. We need not be detained by this contention. In reviewing a placement under the Act, a district court must make an independent determination based on a preponderance of the evidence, giving due weight to the state administrative proceedings. *Rowley*, 458 U.S. at 206, 102 S.Ct. at 3050. In a thorough opinion, the district court did exactly that, specifically citing the evidence in its record and the administrative record that supported its conclusion, as well as discussing the conflicting evidence. The district judge placed particular emphasis on evidence that S.G. tended to regress when at home for more than a week, that he would not adjust well socially to the less structured environment of

Brooklawn, and that his communication skills would develop better where his peers knew and used sign language. 589 F.Supp. at 273–75. The Board has referred us to no other evidence that would tend to indicate that the district court's finding was clearly erroneous or, indeed, even erroneous.

### CONCLUSION

For the foregoing reasons, the judgment of the district court will be affirmed.