**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-1840
_____

Y.B., on behalf of S.B.; F.B., on behalf of S.B.

v.

HOWELL TOWNSHIP BOARD OF EDUCATION,

Y.B., on behalf of S.B.,
Appellant
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 3-18-cv-10950)
District Judge: Honorable Brian R. Martinotti
_____

Submitted on January 21, 2021

Before:
HARDIMAN, ROTH, *Circuit Judges*, and PRATTER,[*]
*District Judge*.

(Filed: July 19, 2021)

Michael I. Inzelbuch
555 Madison Avenue
S.I. Bank & Trust Building
Lakewood, NJ 08701

    *Counsel for Appellant*


Viola S. Lordi
Eric J. Marcy, Sr.
Wilentz Goldman & Spitzer
90 Woodbridge Center Drive
Suite 900, Box 10
Woodbridge, NJ 07095

    *Counsel for Appellee*

---

[*] The Honorable Gene E.K. Pratter, District Judge, United States District Court for the Eastern District of Pennsylvania, sitting by designation.

_____

OPINION OF THE COURT
_____

HARDIMAN, *Circuit Judge*.

This appeal arises under the Individuals with Disabilities Education Act (IDEA). 20 U.S.C. § 1400 *et seq.* Section 1415(j) of that law—commonly known as the "stay-put" provision—provides generally that eligible students must remain in their current educational settings during certain procedures. But Section 1414(d)(2)(C)(i)(I)—the intrastate transfer provision—says that schools need only provide eligible transfer students comparable services to those they were previously receiving. The question presented is whether the "stay-put" provision applies, thereby requiring provision of the *same* services the child was previously receiving, when a student voluntarily transfers school districts within a state. Like the District Court, we hold it does not.

I

A

S.B. is a twelve-year-old boy diagnosed with Down Syndrome. As a result, he "shows delays in cognitive, social, and motor areas," Dist. Ct. Dkt. No. 1-3, at 3, and requires special educational care. In 2014, S.B. and his parents moved from Brooklyn, New York, to Lakewood, New Jersey. Upon the family's arrival, S.B.'s parents requested an individualized education program (IEP) for S.B. from the Lakewood Township School District. *Id.* Lakewood determined it could not provide S.B. an IDEA-mandated free appropriate public

education (FAPE) at its own public schools, so it crafted an IEP that placed S.B. at the private School for Children with Hidden Intelligence (SCHI). Lakewood reimbursed Appellant for SCHI-associated costs.

In November 2016, shortly after S.B.'s Lakewood IEP was renewed for another year—including the provision providing for his placement at SCHI—the family moved homes and transferred S.B. from Lakewood to the Howell School District. Howell's staff reviewed the Lakewood IEP and met with S.B. and his parents at Memorial Elementary School. After meeting with S.B., Howell informed Appellant "that [S.B.'s] IEP can be implemented in [Howell's special education] class at Memorial Elementary School where [S.B.] will receive a free appropriate public education in the least restrictive environment." Dist. Ct. Dkt. No. 20-7, at 1. Despite this assurance, Appellant continued to send S.B. to SCHI. On February 3, 2017, Howell terminated S.B.'s enrollment.

B

In July 2017, over seven months after Howell informed Appellant it would provide S.B. a FAPE in accordance with his IEP, Appellant requested a due process hearing under the IDEA. *See* 20 U.S.C. § 1415(f). Appellant challenged Howell's refusal to implement S.B.'s IEP—which he argued required S.B.'s continued attendance at SCHI regardless of Howell's ability to provide the services the IEP called for—and asserted that Howell must reimburse Appellant for S.B.'s SCHI tuition. In April 2018, an administrative law judge ruled for Howell. Two months later, Appellant filed a complaint in

4

the District Court alleging Howell violated the IDEA.[1] In March 2020, the District Court affirmed the ALJ and granted summary judgment for Howell. Appellant timely appealed.

## II

Y.B.'s cause of action arose under the IDEA, 20 U.S.C. § 1415(i)(2)(A), so the District Court had federal question jurisdiction under 28 U.S.C. § 1331. Our jurisdiction lies under 28 U.S.C. § 1291. We review the District Court's legal conclusions de novo and its findings of fact for clear error. *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014). When, as in this case, the District Court reviews an ALJ's decision, we apply a "modified de novo" standard of review, giving "due weight" to the factual determinations of the ALJ, which we consider "prima facie correct." *Id.* at 266.

## III

In 1975, Congress enacted the Education for All Handicapped Children Act (since retitled the IDEA), *see* 20 U.S.C. § 1400 *et seq.*, after determining that a majority of the Nation's disabled children were not receiving adequate public educational services.[2] The law sought "to ensure that all

---

[1] Appellant also alleged Howell violated comparable provisions of the New Jersey Code. The District Court exercised supplemental jurisdiction over those claims under 28 U.S.C. § 1367. On appeal, Appellant does not argue the state law claims, citing the New Jersey Code only twice in passing in his opening brief.

[2] The Act "was passed in response to Congress' perception that a majority of handicapped children in the United States 'were

5

children with disabilities have available to them a free appropriate public education," or FAPE. § 1400(d)(1)(A). Under the IDEA, a FAPE includes "special education and related services"—both "designed instruction . . . to meet the unique needs of a child," and "other supportive services" necessary to guarantee a child benefits from his special education. § 1401(9), (26), (29).

"The IDEA offers federal funds to States in exchange for a commitment[] to furnish" a FAPE "to all children with certain physical or intellectual disabilities." *Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 748 (2017). Congress recognized, however, that the failure of schools to educate disabled students "reflected more than a lack of financial resources at the state and local levels." *Honig v. Doe*, 484 U.S. 305, 309 (1988). So the IDEA "confers upon disabled students an enforceable substantive right to public education in participating States." *Id.* at 310; *see also Fry*, 137 S. Ct. at 749. The IDEA also incorporates state law pertaining to the educational rights of disabled students so schools must comply with both the substantive and procedural requirements of the IDEA and state standards. § 1401(9)(B).

---

either totally excluded from schools or [were] sitting idly in regular classrooms awaiting the time when they were old enough to drop out.'" *Geis v. Bd. of Educ. of Parsippany-Troy Hills*, 774 F.2d 575, 577 (3d Cir. 1985) (quoting H.R. REP. NO. 94-332, at 2 (1975)). The federal programs that did exist at that time to assist disabled students were recognized as "minimal, fractionated, uncoordinated, and frequently given a low priority in the education community." H.R. REP. NO. 94-332, at 2.

The "primary vehicle," *Honig*, 484 U.S. at 311, for providing each eligible student with an IDEA-mandated FAPE is the IEP, § 1414(d). An IEP is a written statement, "developed, reviewed, and revised" by the "IEP Team"—a group of school officials and the parents of the student—that spells out how a school will meet an individual disabled student's educational needs. § 1414(d)(1)(A), (B). Most notably, an IEP describes a child's "present levels of academic achievement," offers "measurable annual goals" to "enable the child to . . . make progress in the general educational curriculum," and describes "supplementary aids and services . . . provided to the child" to meet those goals. § 1414(d)(1)(A)(i)(I), (II)(aa), (IV); *accord Fry*, 137 S. Ct. at 749. Of particular relevance here, an IEP focuses on the services needed to provide a student with a FAPE, not on the brick-and-mortar location where those services are provided.

Expecting that parents and school officials would sometimes disagree about which services were necessary for a disabled child to receive a FAPE, Congress created dispute-resolution procedures in the IDEA. Those protections give parents the right to: "examine all records" relating to their child's education, § 1415(b)(1); receive written notification before any changes are made to their child's IEP, § 1415(b)(3); file a complaint about the provision of a FAPE, § 1415(b)(6); pursue mediation, § 1415(e); begin an "impartial due process hearing" before a state educational agency, § 1415(f); and, if still unsatisfied, seek judicial review by filing an action in a competent state or federal court, § 1415(i)(2).

IV

A

Having discussed the general structure of the IDEA, we turn now to the two provisions at issue in this case. The "stay-put" provision provides that "during the pendency" of certain administrative and legal proceedings, "unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child." 20 U.S.C. § 1415(j).[3] The IDEA's intrastate transfer provision, on the other hand, provides that a school district receiving an intrastate transfer student with a previously existing IEP "shall provide . . . a free appropriate public education, including *services comparable* to those described in the previously held IEP, in consultation with the parents until such time as the [new district] adopts the previously held IEP or develops, adopts, and implements a new IEP." 20 U.S.C. § 1414(d)(2)(C)(i)(I) (emphasis added). In a

---

[3] Since Appellant did not begin a due process hearing under the IDEA until July 2017, it is unclear whether any "stay-put"-eligible proceedings were pending when the dispute between Howell and Appellant arose in January 2017. *See Michael C. ex rel. Stephen C. v. Radnor Twp. Sch. Dist.*, 202 F.3d 642, 654 (3d Cir. 2000); *Kari H. ex rel. Dan H. v. Franklin Special Sch. Dist.*, 125 F.3d 855 (table), 1997 WL 468326, at *6 (6th Cir. 1997) (per curiam) (listing "due process hearings," "state administrative review," and "civil actions brought in either state or federal district court" as the only ways to trigger the "stay-put" provision). Howell did not make this argument, so we assume that qualifying proceedings were pending when the dispute between the parties began.

8

broad sense, then, both provisions discuss the procedural safeguards afforded to students during periods of educational transition. Unlike the "stay-put" provision—which requires the continued implementation of the child's original IEP—the intrastate transfer provision requires only that the new district provide "services comparable" to those in the child's most recent IEP. *See id.*

We must first determine which of these two competing provisions—each requiring something different from Howell (the "same" IEP under the "stay-put" provision, or "comparable services" under the intrastate transfer provision)—governs this case. Appellant argues the "stay-put" provision controls, while Howell claims the intrastate transfer provision applies. We agree with Howell, and hold that in a voluntary intrastate transfer, the "stay-put" provision does not apply, and the new school district need only provide "services comparable" to those the student had been receiving under the IEP in effect before the transfer. Two flaws in Appellant's proffered approach compel this result. First, Appellant's broad reading of the "stay-put" provision—that it governs even voluntary intrastate transfers—would render § 1414(d)(2)(C)(i)(I) a nullity. *See Colautti v. Franklin*, 439 U.S. 379, 392 (1979) (noting "the elementary canon of construction that a statute should be interpreted so as not to render one part inoperative," "redundant," or "largely superfluous"); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 174–79 (2012) (discussing the Surplusage Canon). Second, Appellant's approach would make school district compliance with the IDEA's transfer provisions contingent on the unilateral power of the parent to invoke the "stay-put" provision. Even if the new district could provide the transferee

child with all the services listed in his IEP, it would be precluded from doing so under Appellant's approach if the parent simply invoked the words "stay-put." We do not read the "stay-put" provision to give parents the unilateral power to prevent schools from complying with the IDEA.

Precedent analyzing "stay-put" buttresses our decision. In *Honig*, the Supreme Court explained that "stay-put's" expansive text is limited by the IDEA's purpose—to "strip schools of the *unilateral* authority they had traditionally employed to exclude disabled students . . . from school." 484 U.S. at 323. For that reason, we have explained that the "stay-put" provision "reflect[s] Congress's conclusion that a child with a disability is best served by maintaining her educational status quo until the disagreement over her IEP is resolved." *M.R. v. Ridley Sch. Dist.*, 744 F.3d 112, 118 (3d Cir. 2014). The "stay-put" provision realizes this purpose by implementing "a type of 'automatic preliminary injunction' preventing *local educational authorities* from unilaterally changing a student's existing educational program." *Michael C. ex rel. Stephen C. v. Radnor Twp. Sch. Dist.*, 202 F.3d 642, 650 (3d Cir. 2000).

The purpose just described is not implicated, however, when a *parent* unilaterally acts to change a student's school district. When a student voluntarily transfers to a new district, "the status quo no longer exists." *Ms. S. v. Vashon Island Sch. Dist.*, 337 F.3d 1115, 1133 (9th Cir. 2003), *superseded by statute on other grounds as stated in G.M. ex rel. Marchese v. Dry Creek Joint Elementary Sch. Dist.*, 595 F. App'x 698 (9th Cir. 2014). In such situations, the parents of the student must accept the consequences of their decision to transfer districts.

Given the tailored nature of the intrastate transfer provision, we hold that the "stay-put" provision does not apply when a student voluntarily transfers school districts within a state and the new school district will satisfy the IDEA by complying with the intrastate transfer provision.

B

1

Having determined that Howell did not have to adhere to the exact requirements of Lakewood's IEP (much less the continued physical placement of S.B. at the private SCHI, as Appellant argues), we turn to whether Howell satisfied its obligation to provide S.B. a FAPE as required by the IDEA. According to Appellant, Howell's services were not comparable to those S.B. received at SCHI.

The record lacks evidence to support Appellant's claim. Appellant blames this lack of evidence on the fact he was "never . . . afforded an opportunity to challenge Howell's representation that its program was either appropriate or comparable to what S.B. had been receiving at SCHI." Reply Br. 7. This is true, but only because of Appellant's unilateral decision to keep S.B. enrolled in SCHI and away from Memorial Elementary. Appellant cannot saddle the school district with the consequences of his decision.

On the record before us, we cannot say the services were not comparable. Ample evidence shows Howell intended to provide "services comparable to those described in [S.B.'s] previously held IEP." 20 U.S.C. § 1414(d)(2)(C)(i)(I). After the Howell IEP Team met S.B. and reviewed his Lakewood IEP, it produced a memorandum listing these services S.B.

11

would receive at Memorial Elementary: "speech therapy three times a week in an individual setting and once a week in a group setting; occupational therapy two times a week in an individual setting and once a week in a group setting; and physical therapy once a week in a group setting." *Y.B. ex rel. S.B. v. Howell Twp. Bd. of Educ.*, 2020 WL 1320137, at *2 (D.N.J. Mar. 20, 2020). That therapy schedule matches the one S.B. received under his Lakewood IEP. Howell also "arranged for the provision of related services for S.B. consistent with the Lakewood IEP and . . . made arrangements for transportation services for S.B. and his special need for a welcome on the school bus." *Y.B.*, 2020 WL 1320137, at *2.

Rather than sending S.B. to Howell and then challenging the services as inadequate through a due process hearing—the procedure contemplated by the IDEA—Appellant eschewed the school district's offer, refused to send S.B. to Howell, and unilaterally continued his placement at SCHI. In doing so, Appellant prevented Howell from implementing its services at all, so there is no evidence the services offered were not "comparable." Because the record lacks evidence of non-comparable services, Howell did not violate the IDEA.

2

The requirements of the intrastate transfer provision extend beyond merely the provision of comparable services, and include the eventual development, adoption, and implementation of a new IEP (or the adoption of the previous IEP) by the transferee district. When a parent's conduct bypasses the procedures contemplated by the IDEA, the parent deprives the school of the opportunity to comply with the law. Here, Appellant's actions prevented the Howell staff from

12

having the chance to "develop[], adopt[], and implement[] a new IEP" for S.B. 20 U.S.C. § 1414(d)(2)(C)(i)(I). Under these circumstances, Howell cannot be liable for not creating a tailored IEP for S.B.

Because the record discloses no evidence that Howell failed to provide S.B. with services comparable to those set forth in his prior IEP, the District Court did not err in holding that Howell satisfied the intrastate transfer provision.

V

Appellant also claims he is entitled to a reimbursement from Howell for the costs of S.B.'s attendance at SCHI (for the period between December 2016 and July 2017). We disagree. "[P]arents who unilaterally change their child's placement . . . without the consent of state or local school officials, do so at their own financial risk" because if a school district meets its IDEA obligations "the parents would be barred from obtaining reimbursement for any interim period." *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 373–74 (1985).[4] Because the "stay-put" provision does not apply and all the evidence shows that Howell stood ready to provide comparable services, Howell is not responsible for reimbursements.

---

[4] In *Burlington*, the Supreme Court addressed the Education of the Handicapped Act (EHA), a predecessor of the IDEA. "EHA jurisprudence concerning appropriate remedies has, however, been incorporated wholesale into IDEA jurisprudence." *D.F. v. Collingswood Borough Bd. of Educ.*, 694 F.3d 488, 496 n.8 (3d Cir. 2012).

\* \* \*

The IDEA aims to ensure "that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A). For students who voluntarily transfer districts within a state, we hold the "stay-put" provision inapplicable, and a school district will meet its FAPE obligations by complying with the intrastate transfer provision. And when a school district meets its FAPE obligations, parents have no right to reimbursement of tuition costs. For these reasons, we will affirm.

*Y.B. v. Howell Township Board of Education*, No. 20-1840

ROTH, <u>Circuit Judge</u>, concurring:

In view of Y.B.'s position that the stay put rule must apply here, I would like to expand upon the reasons that, in an intrastate-transfer case such as this one, the stay-put provision is not applicable in determining a child's placement.

The stay-put provision "reflect[s] Congress's conclusion that a child with a disability is best served by maintaining her educational status quo until the disagreement over her IEP is resolved."[1] "[W]hen a plaintiff has challenged the student's educational placement in place at the time the 'stay-put provision' is invoked,"[2] courts typically look to the last agreed upon placement prior to the dispute over the proposed placement.[3] Yet, when a student transfers to a new school district, that is not so. In that situation, contrary to Y.B.'s position before us, the intrastate-transfer provision governs the placement of the child.

In *Michael C. ex rel. Stephen C. v. Radnor Twp. Sch. Dist.*,[4] we suggested that a state's agreement might be sufficient to bind a local school district to the placement provided for in a particular IEP. However, we did not in *Michael* have to decide the issue in the context of an intrastate

---

[1] *M.R. v. Ridley Sch. Dist.*, 744 F.3d 112, 118 (3d Cir. 2014).

[2] *G.B. v. Dist. of Columbia*, 78 F. Supp. 3d 109, 113 (D.D.C. 2015).

[3] *E.g., Ventura de Paulino v. N.Y.C. Dep't of Educ.*, 959 F.#d 59, 532 (2d Cir. 2020).

[4] 202 F.3d 642, 650 (3d Cir. 2000).

1

transfer. Addressing interstate transfers, we held in *Michael* that "when a student moves from State A to State B, any prior IEP in effect in State A need not be treated by State B as continuing automatically in effect."[5] "Because Congress left primary responsibility for providing a FAPE and for implementing the IDEA to the states, we [found] it unlikely that Congress intended the stay-put provision . . . to impose a requirement on states that they must implement an IEP established in another state without considering how consistent that IEP was with the policies and mandates of the student's new residential state."[6] Moreover, although *Michael* was decided before the intrastate-transfer provision, and nearly-identical interstate-transfer provision,[7] were enacted, those provisions do not undermine – indeed, they enhance – *Michael*'s holding that the stay-put provision sometimes must yield to other provisions of the IDEA.

The first reason for which the stay-put provision must yield to the intrastate-transfer provision is because the text of the intrastate-transfer provision and its accompanying regulations state that a transferee school district "shall provide" a FAPE "including services *comparable* to those in the previously held IEP."[8] It speaks in mandatory terms, acknowledges the existence of a "previously held IEP," explicitly excuses strict compliance with that IEP, and does not create an exception for situations where the parents initiate a due process hearing. The term "*previously held* IEP," combined with the intrastate-transfer provision's title,

---

[5] *Id.* at 651.
[6] *Id.* at 650.
[7] 20 U.S.C. § 1414(d)(2)(C)(i)(II).
[8] 20 U.S.C. § 1414(d)(2)(C)(i)(I) (emphasis added).

2

"Program for children who transfer school districts," further confirms that the *previously held* IEP is no longer the mandatory standard used to determine the child's placement.

Moreover, the IDEA's accompanying regulations provide more generally that a "child's placement . . . [i]s *based* on the child's IEP,"[9] not that the placement must be identical to the placement in the previously held IEP. Although the regulations state that "[t]he placement decision . . . [i]s made by a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options,"[10] the intrastate-transfer provision requires the new school district to provide comparable services "in consultation with parents," not to give the parents a veto power. Indeed, it is ultimately the school district that makes a placement decision.[11] "Parental dissatisfaction is channeled through administrative and (if necessary) judicial proceedings."[12]

Second, even though the Lakewood IEP's placement was determined in accordance with state procedures, we do not think that Howell should be bound by all of Lakewood's decisions. The IDEA requires each local educational agency to adopt its own "policies, procedures, and programs that are consistent with the State policies and procedures" for

---

[9] 34 C.F.R. § 300.116(b)(2) (emphasis added).

[10] *Id.* § 300.116(a)(1).

[11] *See, e.g., Doe v. E. Lyme Bd. Of Educ.*, 790 F.3d 440, 449 (2d Cir. 2015) ("the duty to issue an IEP remains with the educational agency . . . and a parent's right of participation is not a right to 'veto' the agency's proposed IEP.")

[12] *Id.*

3

providing a FAPE.[13]  The Lakewood IEP was adopted under Lakewood's policies and procedures, not Howell's.  The stay-put provision "prevents[s] local educational authorities from unilaterally changing a student's existing educational program,[14] but it does not allow parents to impose one school district's policies onto another school district by voluntarily moving there.  Moreover, New Jersey's "approval" of the Lakewood IEP was made under circumstances that no longer apply:  the fact that S.B. had been residing in a district that could not provide a FAPE for S.B.  As explained above, Howell has offered to provide a FAPE for S.B.

Third, Y.B.'s approach to the stay-put provision leaves no textual basis for an exception in cases where an intrastate-transfer renders strict compliance with the previous IEP impossible.[15]  Although that situation is not before us, it is not clear how such an exception could exist if we hold, as Y.B. argues, that the "comparable" services provision in § 1414(d)(2)(C)(i)(I) must take a backseat to the stay-put provision.

Finally, "a more specific provision governs over a more general statute when there is conflict between the two statutes."[16]  To the extent that there is any conflict between the intrastate-transfer and stay-put provisions, the intrastate-

---

[13] 20 U.S.C. § 1413(a)(1).

[14] *Michael*, 202 F.3d at 650.

[15] *Cf. Ms. S. v. Vashon Island Sch. Dist.*, 337 F.3d 1115, 1134 (9th Cir. 2003), superseded by statute on other grounds as stated in *G.M. ex rel. Marchese v. Dry Creek Joint Elementary Sch.Dist.*, 595 F. App's 698 (9th Cir. 2014).

[16] *In re Udell*, 454 F.3d 180, 186 (3d Cir. 2006).

transfer provision more specifically addresses what statutory requirements apply to transfer students. Therefore, the intrastate-transfer provision governs.

In summary, when a student voluntarily transfers to a new district, the parents must accept the consequences of their decision: that there is no longer any agreed-upon placement and therefore "the status quo no longer exists."[17] Although "parents [can] unilaterally change their child's placement," they "do so at their own financial risk."[18] If the courts ultimately determine that the IEP proposed by the transferee school officials is appropriate, the parents are barred from obtaining reimbursement for any interim period.[19]

I agree with our holding that S.B.'s educational placement at the time the dispute arose would be the "comparable services" offered by Howell. It was not his placement at SCHI.[20] Accordingly, I concur with the judgment of the Court.

---

[17] *Ms. S.*, 337 F.3d at 1134.
[18] *Sch. Comm. of Town of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 373-74 (1985).
[19] *See id.*
[20] *Cf. N.W. ex rel. J.W. v. Boone Cty. Bd. Of Educ.*, 763 F.3d 611, 617 (6th Cir. 2014)) (holding that the private school to which parents sent child was not the child's current placement because the school district never agreed to the placement).

5