993 F.2d 1031
 83 Ed. Law Rep. 71, 2 A.D.D. 14
 Myron FUHRMANN; Perri Fuhrmann, on Behalf of their minor
son, Garrett FUHRMANN
v.
EAST HANOVER BD. OF EDUCATION. (Two Cases)
G.F., a minor child by his parents, M.F. and P.F., Appellants.
 No. 92-5218.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 17, 1992.
Decided May 6, 1993.
Rehearing Denied June 8, 1993.
 
 Herbert D. Hinkle (argued), Lawrenceville, NJ, for appellant.
 Joseph S. Accardi (argued), Litvak & Accardi, Livingston, NJ, for appellee.
 Before: MANSMANN, HUTCHINSON and GARTH, Circuit Judges.
 OPINION OF THE COURT
 GARTH, Circuit Judge:
 
 
 1
 This appeal presents us with the question of whether the appellant, G.F., a handicapped child, received proper educational placement in accordance with the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C.A. § 1401 et seq. (West Supp.1992). After reviewing the record developed by the Administrative Law Judge pursuant to 20 U.S.C.A. § 1415(e)(2) (West Supp.1992), the Honorable Maryanne Trump Barry of the New Jersey District Court determined that compliance had been had with both the procedural and substantive requirements of the IDEA as well as with the federal and state regulations promulgated thereunder.
 
 
 2
 Judge Barry found that G.F.'s placements for the school years 1989-90 and 1990-91 were appropriate within the meaning and terms of the Act in that they were reasonably calculated to enable G.F. to receive educational benefits and meet his individual needs. See Board of Education of the Hendrick Hudson Central School District v. Rowley, 458 U.S. 176, 206-07, 102 S.Ct. 3034, 3050-51, 73 L.Ed.2d 690 (1982). In so finding, Judge Barry reviewed the entire record and addressed all of the arguments advanced by G.F. and by the East Hanover Board of Education.
 
 
 3
 Our review of Judge Barry's decision is plenary with regard to its legal analysis, however, "our review must be conducted within the general framework of deference to state decision-makers dictated by the [IDEA and the Supreme Court's opinion in Board of Education of the Hendrick Hudson Central School District v. Rowley, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982).]" Wexler v. Westfield Board of Education, 784 F.2d 176, 181 (3d Cir.1986). Therefore, like Judge Barry, who gave "due weight" to the record before her, we too must afford "due weight" to the underlying administrative proceedings. Rowley, 458 U.S. at 206, 102 S.Ct. at 3051.
 
 
 4
 Judge Barry's thoughtful and well reasoned opinion in this case not only satisfies our review under the relevant standard, but convinces us that her analysis is not one upon which we can improve. By writing separately we would be adding nothing of substance to Judge Barry's review of the record and hence we would be doing no more than paraphrasing what has already been written by a perceptive and distinguished judge. Accordingly, because Judge Barry's opinion was not published, we take this occasion to reprint it in full. We adopt its analysis, reasoning and holding as our own.
 
 I.
 
 5
 UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY
 
 G.F., a minor child by his
 
 6
 parents, M.F. and P.F.
 
 
 7
 Plaintiff,
 
 VS.
 EAST HANOVER BOARD OF EDUCATION
 
 8
 Defendant.
 
 
 9
 Civil Action No.
 
 89-4858(MTB)
 OPINION
 I. Introduction
 
 10
 Presently before the court is an application by G.F., an eight year old boy classified as preschool handicapped, for an independent review of two New Jersey Office of Administrative Law decisions regarding his education in the 1989 and 1990 school years. Specifically, G.F. seeks a determination that respondent East Hanover Board of Education ("East Hanover" or "the Board") violated the procedural and substantive requirements of the Individuals with Disabilities Education Act ("IDEA" or the "Act"), 20 U.S.C. § 1401 et seq. The Board contends that its actions complied with the Act and maintains that its placement was proper according to law.
 
 II. Background
 
 11
 Mr. and Mrs. Fuhrmann, G.F.'s parents, began to notice developmental problems with G.F. when he was approximately one year old. 89T2:5.[1] He would tap his ear with a shoelace for long periods of time and make whistling sounds. As he got older, he also began hitting and pinching others and being destructive. 89T2:4-9. In September, 1988, G.F. became eligible for and was enrolled in the East Hanover Preschool Education Program for the 1988-89 school year. Pretrial Stipulation at 2. The program lasted two and one half hours per day, four days a week, with occupational therapy two times a week. In addition, the Fuhrmanns provided supplemental speech and occupational therapy on their own.
 
 
 12
 Although characterized differently by the parties, G.F.'s progress over the course of the 1988-89 school year was, by all accounts, slow. Mrs. Fuhrmann testified that she noticed some progress in the language area, where G.F.'s spoken vocabulary increased and he was able to point to objects on picture cards. She also noticed slight social progress in that G.F. recognized children and would touch their hair. 89T2:39-41. G.F.'s speech therapist at East Hanover, Theresa Gallagher, testified that he began to recognize common objects and that his in-school vocabulary increased from 0 to approximately 25 words. 89T4:194-96. Joanne Petriello, G.F.'s occupational therapist, noted that his improvement with building blocks, jumping on a trampoline, and catching a ball indicated improvement in his fine and gross motor skills. 89T4:243-45. Similarly, G.F.'s teacher, Delores DelPlato, testified that his fine motor skills increased somewhat over the course of the year. 89T4:99-102. Nevertheless, of the 41 goals and objectives set out for G.F. for the 1988-89 school year, only one was fully accomplished, while the other 40 were carried over as goals for 1989-90. 89T4:150-62; 89E9, 23, & 26. Certainly, serious behavioral problems remained.
 
 
 13
 In the spring of 1989, the Fuhrmanns retained a behavioral therapist for G.F. at their own expense. G.F. responded very quickly to the methods used by the behavioral therapist, and Mrs. Fuhrmann began using the techniques at home. 89T2:50-53. Within weeks, G.F. was toilet trained. Id. Indeed, G.F.'s occupational therapist at school asked if Mrs. Fuhrmann would demonstrate her methods to the other teachers. 89T2:56-57. Based on G.F.'s progress, the Fuhrmanns requested that East Hanover place him in a full day behavioral oriented program beginning in the summer of 1989. East Hanover denied this request, indicating that G.F.'s current program was appropriate and that, in any event, summer preschool handicapped programs would be offered only to children who would suffer irrevocable regression during the summer. See 89E11 at 2. The Fuhrmanns subsequently enrolled G.F. at the State Street School ("State Street") at their own expense. Pretrial Stipulation at 3.
 
 
 14
 G.F. remained at State Street for the summer of 1989 and throughout the 1989-90 school year. His progress was considerably more dramatic than the previous year. Carolyn Gallagher,[2] the director of State Street, testified that over the course of the 1989-90 school year, G.F. showed significant gains in many areas of development, accomplishing approximately 42 or 43 of 50 goals set for that period. 90T3:61. At the end of the year he was more willing to learn, more social, more aware, and more verbal. 90T3:63. Mrs. Fuhrmann also testified as to G.F.'s improvement in the areas of self-help and play skills. 90T4:197-98. For the 1990-91 school year, East Hanover recommended that G.F. be placed in the Morris Union Jointure School. Again, the Fuhrmanns continued him at State Street.
 
 III. Legal Standard
 
 15
 G.F., through his parents, seeks relief for East Hanover's alleged violations of the Individuals with Disabilities Education Act ("IDEA" or "Act"), 20 U.S.C. § 1401 et seq. The action is brought in federal court pursuant to 20 U.S.C. § 1415(e)(2), which provides that an IDEA decision of a state educational agency can be appealed to federal district court.[3] In determining the scope of the district court's review under the IDEA, the Supreme Court has opined that the court must make a twofold inquiry: first, whether the state has complied with the procedures set forth in the Act, and second, whether the individualized educational program ("IEP") developed pursuant to these procedures is "reasonably calculated to enable the child to receive educational benefits." Board of Education of the Hendrick Hudson Central School District v. Rowley, 458 U.S. 176, 206-07, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982). The Court further stated that the statute's language instructing that the district court, "basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate," does not mean that courts are free to substitute their own notions of sound education policy for those of the educational agencies they review, but rather that "due weight" should be given to administrative proceedings. Id. at 205-06, 102 S.Ct. at 3050-51. Finally, it is quite clear that when a change in a child's IEP is sought, regardless of whether the party seeking the change is the school district or the parents, the burden of showing that the placement is "appropriate" rests with the school district. Lascari v. Board of Education of the Ramapo Indian Hills Regional High School District, 116 N.J. 30, 44, 560 A.2d 1180 (1989).
 
 
 16
 In reviewing the record as to plaintiff's challenges to East Hanover's education plan for G.F. for the years 1989 and 1990, each year must be examined independently to determine if the IDEA's procedural and substantive requirements were met. The procedural requirements of the IDEA are set forth in 20 U.S.C. § 1414 and state and federal regulations promulgated thereunder. See 34 C.F.R. § 300.340-300.349; N.J.A.C. 6.28-2.1-3.9. Generally, the regulations require that a child study team ("CST"), consisting of a school psychologist, a learning disabilities teacher-consultant, and a school social worker evaluate the child. N.J.A.C. § 6:2.8-3.4. The agency must hold a meeting at which the parents, at least one teacher with knowledge of the student's performance, the CST, the pupil (if appropriate), and other school personnel or other appropriate individuals classify the child. N.J.A.C. 6:2.8-3.5. Next, the CST, parents, school principal, and other staff members collaborate to formulate, review, or revise an IEP for the child. 34 C.F.R. § 300.344-300.345; N.J.A.C. §§ 6:28-2.3, 6.28-3.1. An IEP must include a statement of current educational status, annual goals, short term objectives, a description of the type of program and reasons for its selection, projected dates for initiation and duration, and some objective criteria by which instructional objectives can be evaluated. 34 C.F.R. § 300.346; N.J.A.C. § 6:28-3.6. Where a child has already been privately placed, the agency must ensure that a representative of the private facility attends the meeting to develop an IEP. 34 C.F.R. § 300.347.
 
 
 17
 Substantively, the IDEA requires states wishing to qualify for federal funds to assure all children with disabilities the right to a free "appropriate public education." 20 U.S.C. § 1412(1). Rowley established that, at a minimum, the Act requires that the program offered must be "sufficient to confer some educational benefit." Rowley, 458 U.S. at 200, 102 S.Ct. at 3048. Although this has been interpreted as a floor beyond which the states may regulate, New Jersey has clearly adopted the federal standard. See Lascari, 116 N.J. at 47, 560 A.2d 1180 (discussing New Jersey Department of Education comment to 1989 regulations disavowing the view that N.J.A.C. 6:28 was intended to create a standard higher than the federal standard). Thus, substantive review of G.F.'s program must revolve around whether it was sufficient to confer some educational benefit on him.
 
 IV. Procedural Claims
 A. 1989-90
 
 18
 Petitioner's procedural arguments related to the 1989-90 school year are twofold. First, petitioner complains that the CST did not meet until June 13, 1989, two months after Dr. Hamway had told the Fuhrmanns that East Hanover intended to continue the same placement for the next year. Respondent has shown that this complaint is belied by the record, and petitioner does not take issue with this showing in his reply brief. In addition, plaintiff claims that during the course of trial below, Dr. Hamway unilaterally offered modifications to the plan. This argument, too, is without merit.
 
 
 19
 Some history is in order. The testimony of Dr. Servello, the school psychologist, indicates that he, the teacher, the teacher's aide, the speech therapist, and the occupational therapist met on June 13, 1989 and formulated a plan for G.F. for the 1989-90 school year. 89T3B:25-28. Although the Fuhrmanns were invited to participate in this process, they apparently declined. 89T3B:25. There is no question that the initial IEP for G.F. for the 1989-90 school year was developed by a properly constituted CST as required under N.J.A.C. § 6:28-3.1(b). See 89T5:158-59 (G.F.'s CST consisted of Servello, Grace Suwinski, a learning disabilities teacher-consultant, Cindy Beltri, a social worker, and Theresa Gallagher, a speech pathologist).
 
 
 20
 The Fuhrmanns contend that East Hanover violated the procedural requirements of the IDEA by modifying G.F.'s IEP in the summer of 1989, after the June meeting, without consulting the CST. The modifications at issue consisted of providing for G.F. to attend the afternoon session of the East Hanover program as well as the morning, as originally proposed, assigning an aide to be with G.F. during the lunch period, and adding the services of a behavioral consultant for two hours per day for ten weeks. The IEP containing these recommendations was first revealed at the trial below by Dr. Hamway on August 22, 1989. 89T4:299. Petitioner's concern is that this recommendation was made without proceeding through the proper channels. 89T4:300-04.
 
 
 21
 As the ALJ made clear, the modifications at issue were not made according to the normal IEP development process, but were made after discussions between the court, counsel, and the parties, with the agreement of all present. 89T4:301. While it is true that petitioner did not clearly waive his right to raise a procedural challenge as to the 1989 plan, he was aware that the recommendations were being made in an extraordinary situation. Moreover, petitioner's claim that the modifications were made without the professional judgment of the CST is not supported by the record. As Dr. Servello testified, the full day program was discussed by the CST in June, 1989, but not recommended because the team felt that it was not essential. 89T4:303-04. Similarly, the behavioral consultant was recommended by Dr. Savage. 89T3B:72. Thus, the modifications were offered as "something more than the minimum requirement" offered to the Fuhrmanns in the spirit of compromise. Id. They were not made without professional judgment and were merely proposals when they were unveiled by Dr. Hamway in August, 1989.
 
 B. 1990-91
 
 22
 Petitioner claims that Dr. Hamway and the East Hanover staff violated the procedural requirements of the IDEA by not consulting Mr. and Mrs. Fuhrmann before making a placement decision for G.F. for the 1990-91 school year. In effect, the Fuhrmanns contend that they were presented with a "done deal" at the classification meeting on June 26, 1990, almost two months before the meeting to formulate an IEP for G.F. for the upcoming school year. In addition, petitioner contends that the failure of the Board to include or seek input from State Street, the Allegro School ("Allegro"), or the Morris Union Jointure School ("Jointure") also violated the procedural requirements of the IDEA.
 
 
 23
 If the Fuhrmanns were, in fact, excluded from the development of G.F.'s 1990-91 IEP or the placement process, then East Hanover violated the procedural requirements of the IDEA and related regulations. See N.J.A.C. § 6:28-2.3(h) (requiring parental participation in development of IEP). Petitioner analogizes to Spielberg v. Henrico County Public Schools, 853 F.2d 256 (4th Cir.1988) in support of this position. However, the record simply does not support a finding of mere "after the fact involvement" as the court in Spielberg found. Spielberg, 853 F.2d at 259. The Fuhrmanns were presented with a draft IEP at a meeting on August 16, 1990.[4] The CST's draft IEP was discussed, and the Fuhrmanns made several suggestions as to how the plan might be changed. 90T2:13-18. The CST considered the Fuhrmanns' suggestions and incorporated some into the IEP. Id. Although the Fuhrmanns ultimately did not sign the revised IEP, there was clearly more than after the fact involvement here. The record indicates that the Fuhrmanns had an opportunity to participate in the IEP formulation process in a meaningful way.
 
 
 24
 Petitioner also claims that Dr. Hamway unilaterally rejected State Street as a potential placement for the 1990-91 school year at the June 26, 1990 classification meeting. This contention is belied by the record below. While it is true that Dr. Hamway indicated at the classification meeting that State Street was not being considered as an appropriate placement, this determination was neither unsupported nor unilateral. See 90T2:69-70. At the June, 1990 classification meeting, recommendations as to possible appropriate placement options for G.F. were presented to the Fuhrmanns. These recommendations were made by the CST after examining State Street's program and considering G.F.'s performance there during the previous year. 90T1:34. Dr. Servello, who endorsed the recommendation of Jointure, visited State Street twice and discussed G.F.'s progress in that program. 90T1:34-37, 48. Moreover, there was no final placement decision presented at the classification meeting. Dr. Hamway and the CST simply indicated that Jointure was one program option for the Fuhrmanns to consider and that, in the opinion of the CST, State Street would not be an appropriate option. 90T1:32. When the Fuhrmanns raised the question of State Street again at the IEP meeting in August, 1990, the CST members present explained why they felt that State Street was not an appropriate placement option. 90T2:70; 90T4:219-20.
 
 
 25
 Petitioner's argument that the absence of representatives from Jointure or Allegro at the IEP meeting violated the Act is also without merit. As petitioner recognizes in his brief, 34 C.F.R. § 300.347(a)(2) requires that before a public agency places a child in a private school, it must ensure that a representative of the private school is present at the IEP meeting. In the instant case, East Hanover recommended placement at Jointure, which is a public school. Therefore, § 300.347(a)(2) is inapplicable.[5]
 
 V. Substantive Claims
 A. 1989-90
 
 26
 Petitioner bases his substantive arguments as to the 1989-90 school year on the premise that G.F. required a full-time behavioral program. As evidence of this, petitioner draws a comparison between G.F.'s progress over the course of the 1988-89 school year in the East Hanover program and his progress in the 1989-90 school year, which he spent at State Street. Of course, the standard which East Hanover must meet, as set forth in Rowley, is that of an "appropriate" education. Thus, this court's inquiry is not whether State Street was better for G.F., as it appears to have been, but whether the placement of G.F. in East Hanover's Preschool Handicapped program during 1989-90 was appropriate.
 
 
 27
 The weight of the evidence supports a conclusion that the placement of G.F. for the 1989-90 year was appropriate. Clearly, the program was sufficient to confer some educational benefit upon G.F. Although petitioner's expert, Dr. Handleman, testified that G.F. should be placed in a full-time behavioral oriented program, see 89T1:68-72, this opinion was not universally held. For instance, Dr. Savage testified that, in his opinion, East Hanover's Preschool Handicapped program was appropriate. 89T3B:71, 75, 77, 90. While he made some recommendations to East Hanover as to how to "enhance" the program for G.F., overall he felt that the placement of G.F. was appropriate. 89T3B:71. In addition, Dr. Katcher, a medical doctor who examined G.F. in June, 1989, indicated that he did not believe that G.F. was autistic and opined that while "behavioral techniques may very well be helpful for him," social communication and language function were "the major issues." 89E24 at 5-6. In short, East Hanover's recommended placement in its Preschool Handicapped program for 1989-90 was appropriate.[6]
 
 B. 1990-91
 
 28
 Petitioner bases his substantive claims relating to the 1990-91 school year on his contention that the recommended placement in the Jointure program was inappropriate. In support of this position, petitioner argues primarily that because Jointure was new and, therefore, could not be observed in operation prior to East Hanover's recommendation of the program for G.F., it was not reasonably calculated to meet G.F.'s individual needs. The Fuhrmanns also argue that moving G.F. from State Street, where they enrolled him for the 1989-90 school year, to Jointure would cause him to regress.[7]
 
 
 29
 Contrary to petitioner's assertions, East Hanover's recommended placement in the Jointure program for 1990-91 was appropriate. The school offered one-on-one programming in a longer school day than alternative programs, a full time behavioral consultant, occupational therapy, speech therapy, and transitional programming. 90T1:20-22. In addition, the CST clearly considered Jointure to be the least restrictive environment as defined in N.J.A.C. § 6:28-2.10. In particular, Jointure is a public school and is closer to G.F.'s home than any of the alternative placement options, including State Street. 90T1:22. Jointure also offered a gymnasium, cafeteria, and school nurse on site. 90T1:79, 82.[8]
 
 
 30
 The fact that the Jointure program was in its inception when East Hanover recommended placement there does not make that placement inappropriate. G.F.'s acceptance at Jointure was unconditional. 90T1:112. At the time of the administrative hearing, Jointure had already accepted four students for the 1990-91 school year, ranging in age from five to eight and exhibiting approximately the same level of autistic-like behavior as G.F. Even Dr. Handleman, an expert witness for petitioner, testified that his only reservation about Jointure was that it was new and, therefore, had no track record.[9] 90T4:61, 108.
 
 
 31
 Moreover, the risk of regression resulting from a change in programs for G.F. was not so great as to render Jointure inappropriate. Although Dr. Handleman expressed reservations due to potential regression, see 90T4:68-70, he recognized that G.F. did not suffer any substantial regression when he transferred from East Hanover to State Street. 90T4:113. Dr. Servello indicated that, in his opinion, the risk of regression for G.F. in moving to Jointure was no greater than any other change in program. 90T1:25-26. Furthermore, Dr. Parmelee noted that while there would be a period of adjustment for G.F. in switching programs, she expected that there would be no academic regression for G.F. 90T1:92. In other words, there is no reason to conclude that G.F. would suffer anything other than "normal" regression associated with any change of program. This did not render East Hanover's recommended placement in Jointure inappropriate.
 
 VI. Conclusion
 
 32
 In summary, I find that East Hanover complied with the procedural requirements of the IDEA and the federal and state regulations promulgated thereunder. In addition, I find that the placement recommended by East Hanover for the school years 1989-90 and 1990-91 were "appropriate" in that they were sufficient to confer some educational benefit on G.F. and meet his individual needs.
 
 
 33
 An appropriate order shall issue.
 
 
 34
 /s/ MARYANNE TRUMP BARRY
 
 
 35
 U.S.D.J.
 
 Dated: March 27, 1992
 II.
 
 36
 Ordinarily, we would conclude our adoption of Judge Barry's opinion simply by reiterating our agreement with its thorough treatment of the issues, its reasoning and its conclusions. However, Judge Hutchinson's thoughtful opinion, in which he concurs with our conclusion as to the 1990-91 placement, but dissents from our conclusion as to the 1989-90 placement, requires that a few more observations be added to our opinion in order that the dissent's concerns may be more specifically addressed.
 
 
 37
 While the dissent argues that evidence of G.F.'s progress at State Street should have been afforded greater weight by the district court,[10] as recognized by Judge Barry, Rowley requires, at the time the initial evaluation is undertaken, an IEP need only be "reasonably calculated to enable the child to receive educational benefits." Rowley, 458 U.S. at 206-07, 102 S.Ct. at 3051 (emphasis added). Our understanding of Rowley comports with that of the district court: that the measure and adequacy of an IEP can only be determined as of the time it is offered to the student, and not at some later date.
 
 
 38
 Judge Mansmann's concurring opinion underscores and emphasizes the importance of this threshold determination. Neither the statute nor reason countenance "Monday Morning Quarterbacking" in evaluating the appropriateness of a child's placement. Thus, Judge Mansmann and I are in complete agreement as to the time when we must look at the "reasonable calculation" made pursuant to Rowley.
 
 
 39
 The district court concluded, and we cannot say erroneously, that, on the record before it, appropriate placement decisions for G.F. had been proposed both as to the 1989-90 and 1990-91 school years. Events occurring months and years after the placement decisions had been promulgated, although arguably relevant to the court's inquiry, cannot be substituted for Rowley's threshold determination of a "reasonable calculation" of educational benefit. Therefore, evidence of a student's later educational progress may only be considered in determining whether the original IEP was reasonably calculated to afford some educational benefit.
 
 
 40
 In this case, even in light of the dramatic progress made by G.F. at State Street, we cannot say, as the district court could not, that G.F.'s 1989-90 and 1990-91 IEPs, formulated by qualified experts in the field, were not "reasonably calculated" to provide some educational benefit. Indeed, to come to a different result as urged by the dissent, we would be obliged to replace the administrative law judge's determination of adequate educational benefit with our own de novo findings. This we are proscribed from doing. See Ingersoll-Rand Financial Corp. v. Anderson, 921 F.2d 497, 504 (3d Cir.1990) ("This court is not a factfinding tribunal.").
 
 
 41
 We will therefore affirm the judgment of the district court.
 
 
 42
 MANSMANN, Circuit Judge, concurring.
 
 
 43
 I concur in the decision that G.F.'s placements for the 1989-90 and 1990-91 school years were appropriate as they were reasonably calculated to enable G.F. to receive educational benefits. I write separately, however, to address the assertion, raised by the Fuhrmanns and accepted by the dissent, that the district court should have placed greater weight on the evidence of G.F.'s progress at the State Street School during the 1989-90 school year in determining whether the placement East Hanover offered G.F. for the 1989-90 school year was appropriate under the IDEA and Rowley.
 
 
 44
 The record from the 1990-91 administrative proceeding, which included G.F.'s experience at the State Street School for the 1989-90 school year, was before the district court when it decided G.F.'s claims for both the 1989-90 and 1990-91 school years. The district court was aware of G.F.'s progress at the State Street School during 1989-90, and of G.F.'s prior minimal progress during the 1988-89 school year at East Hanover. Nonetheless, the court did not explicitly consider the comparative results of the two programs in analyzing G.F.'s substantive claim that the education the East Hanover School Board offered G.F. in 1989 was inappropriate to meet his needs.[1] I find that the district court's refusal to find this comparative evidence dispositive or give it significant weight is consistent with the Supreme Court's decision in Rowley.
 
 
 45
 The district court determined, citing Rowley, that the standard which East Hanover must meet was that of an "appropriate" education. Observing that its inquiry was "not whether the State Street School was better for G.F., as it appears to have been," the district court emphasized that the test was "whether the school district's offer to place G.F. in the East Hanover school during 1989-90 was appropriate." (Opinion at p. 1034.) An appropriate education does not mean the absolute best education or "a potential-maximizing education" for the individual child. See Rowley, 458 U.S. at 197 n. 21, 102 S.Ct. at 3046 n. 21.
 
 
 46
 Rowley's requirement that a school district's program be "reasonably calculated" to enable a child to receive educational benefits is prospective; it is based on an evaluation done by a team of experts prior to the student's placement. At the time of the child's evaluation, the IEP must be reasonably calculated to enable the child to receive educational benefits. Thus I would not view Rowley's test of "appropriateness" as whether the child actually receives educational benefit as a result of his school placement. Instead, the appropriateness of a student's placement must be assessed in terms of its appropriateness at the time it is created and not at some later date when one has the benefit of the child's actual experience.
 
 
 47
 While evidence of what took place after the hearing officer rendered his decision in the fall of 1989 is not relevant in deciding whether G.F.'s 1989-90 placement was appropriate, it might be relevant to the appropriateness of G.F.'s placement for 1990-91. See, e.g., Russell by Russell v. Jefferson School District, 609 F.Supp. 605, 608 (N.D.Calif.1985) (court considered consequences of unsuccessful orthopedic operation which took place after school district's decision and state hearing in order to determine whether student's present IEP and special education placement were appropriate). Indeed, after G.F.'s 1989-90 progress in the State Street's behavioral program became known, some of the experts changed their opinions and testified at the 1990 hearing that they now believed G.F. would be better served in a behavioral program for autistic children, such as the Morris Union Jointure School. Thus the school district's 1990-91 proposal recommended placement for G.F. in a behavioral-based program.
 
 
 48
 Actions of school systems cannot, as the Fuhrmanns and the dissent suggest, be judged exclusively in hindsight. As the Court of Appeals for the First Circuit has observed, an individualized education program ("IEP") is a snapshot, not a retrospective. Roland M. v. Concord School Committee, 910 F.2d 983, 992 (1st Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 1122, 113 L.Ed.2d 230 (1991). In striving for "appropriateness", an IEP must take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was drafted. Id. at 992. Moreover, while G.F.'s progress during the 1989-90 school year at the State Street School is impressive, it cannot be ascertained to what extent the behavioral oriented approach offered at the State Street school was responsible for G.F.'s progress, or whether G.F.'s progress was a result of his own maturation process or other factors.
 
 
 49
 Addressing the issue of whether or not the 1989-90 program recommended by the East Hanover Board of Education was reasonably calculated to enable G.F. to receive educational benefits, I find that it was. The Fuhrmanns' assertion and the dissent's conclusion to the contrary is based on G.F.'s actual experiences at the State Street School which occurred after the school board's placement decision had already been made. The alchemy of "reasonable calculation" necessarily involves choices among educational policies and theories--choices which courts, relatively speaking, are poorly equipped to make. Because I do not think that the district court erred in judging the appropriateness of the school district's offer without giving significant weight to the subsequent experience of the child, I would affirm the judgment under review.
 
 
 50
 HUTCHINSON, Circuit Judge, concurring and dissenting.
 
 
 51
 I respectfully dissent from that part of the Court's opinion affirming the district court's denial of G.F.'s parents' claim for reimbursement of the expense they incurred in connection with G.F.'s 1989-90 attendance at the State Street School ("State Street"). I do so because I disagree with the Court's conclusion that the individualized education program ("IEP") the East Hanover Board of Education ("East Hanover") offered G.F. for the 1989-90 school year was appropriate for his needs. I concur in the result this Court reaches with respect to the 1990-91 school year.
 
 
 52
 My dissent with respect to 1989-90 has two premises: (1) I believe the record shows any educational benefit G.F. might have reasonably been expected to receive from continuing the East Hanover program during the 1989-90 school year was, at best, trivial; and (2) I do not think a trivial benefit meets the United States Supreme Court's appropriateness test of "some" educational benefit. See Board of Educ. v. Rowley, 458 U.S. 176, 200, 102 S.Ct. 3034, 3047, 73 L.Ed.2d 690 (1982). Therefore, I am unable to conclude that the minimal benefit G.F. was likely to have received under East Hanover's 1989-90 plan was appropriate for his individual needs.
 
 I.
 
 53
 I am in basic agreement with the Court on our scope of review, but I think some additional attention to that question in relation to the weight federal courts should give to the state education bureaucracy's administrative prediction that East Hanover's 1989-90 program would be individually appropriate for G.F.'s continuing educational needs is helpful to an analysis of the substantive issues in this case. Whether an IEP is appropriate for the individual for whom it is devised is a mixed question of fact and law. Therefore, we have plenary review over the district court's application of Rowley's substantive rules to the facts of this case. Wexler v. Westfield Bd. of Educ., 784 F.2d 176, 181 (3d Cir.), cert. denied, 479 U.S. 825, 107 S.Ct. 99, 93 L.Ed.2d 49 (1986). Our review, while plenary, must, however, be conducted within a general framework of deference to state decision-makers in recognition of " 'Congress' express efforts to place on ... state educational agencies the primary responsibility for developing a plan to accommodate the needs of each individual handicapped child.' " Id. (quoting Smith v. Robinson, 468 U.S. 992, 1011, 104 S.Ct. 3457, 3468, 82 L.Ed.2d 746 (1984)). The district court's findings of historical fact are, of course, subject to the deferential clearly erroneous standard of review. Id.
 
 
 54
 The Individuals with Disabilities Education Act ("IDEA" or "the Act"), 20 U.S.C.A. §§ 1400-1485 (West 1990 & Supp.1992), requires the district court to "receive the records of the administrative proceedings, ... hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, ... grant such relief as the court determines is appropriate." 20 U.S.C.A. § 1415(e)(2) (West 1990); see Geis v. Board of Educ., 774 F.2d 575, 583 (3d Cir.1985). In doing so, the district court should give the record of the administrative proceeding "due weight." Rowley, 458 U.S. at 206, 102 S.Ct. at 3051. This Court has not yet definitively stated what constitutes "due weight." The United States Court of Appeals for the First Circuit has, however, concluded that the weight due the administrative decision is best left to the discretion of the district court:
 
 
 55
 The traditional test of findings being binding on the court if supported by substantial evidence, or even a preponderance of the evidence, does not apply. This does not mean, however, that the findings can be ignored. The court, in recognition of the expertise of the administrative agency, must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue. After such consideration, the court is free to accept or reject the findings in part or in whole.
 
 
 56
 Town of Burlington v. Department of Educ., 736 F.2d 773, 792 (1st Cir.1984), aff'd sub nom. School Comm. v. Department of Educ., 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985).
 
 
 57
 I have no quarrel with this standard. It is akin to the traditional doctrine that courts should defer to the expertise of administrative agencies in the areas upon which those agencies are called to administer. See generally L. Jaffe, Judicial Control of Administrative Action, at 576-85 (1965). Thus, if the evidence fairly and rationally supports the agency's findings, and those findings are not cast into doubt by other evidence the agency did not have before it, the district court is justified in deferring to the state education authorities' expertise in deciding what educational program is appropriate for an individual child. See Wexler, 784 F.2d at 181. With these standards in mind I turn first to the legal principles involved in deciding whether an IEP is appropriate, and then to their application to the facts of this case.
 
 II.
 
 58
 The Act requires local educational agencies to provide a "free appropriate public education" to all children with handicapping conditions. 20 U.S.C.A. § 1412(1) (West Supp.1992). It is remedial in nature and was enacted to prevent warehousing of handicapped children in special programs that were unresponsive to their individual needs. See School Comm. v. Department of Educ., 471 U.S. at 373, 105 S.Ct. at 2004 (citing 20 U.S.C. § 1400(b)(4); 34 C.F.R. § 300.347(a) (1984)); see also Rowley, 458 U.S. at 179, 102 S.Ct. at 3037. Although the Act requires only that a child receive "some" educational benefit, not the best available education, it also requires a program reasonably calculated to permit the child to benefit educationally. See Rowley, 458 U.S. at 206-07, 102 S.Ct. at 3050-51. Such a program must be capable of advancing the educational goals and needs of an individual child. See id.
 
 
 59
 In Board of Education v. Diamond ex rel. Diamond, 808 F.2d 987 (3d Cir.1986), this Court recognized that "[t]he free appropriate education must ... be 'tailored to the unique needs of the handicapped child by means of an 'individualized education program.' ' " Id. at 991 (quoting Rowley, 458 U.S. at 181, 102 S.Ct. at 3038). We stated that "Rowley makes it perfectly clear that the Act requires a plan of instruction under which educational progress is likely." Id. (emphasis in original). "The Act ... requires a plan likely to produce progress, not regression or trivial educational advancement." Id. (citing Hall v. Vance County Bd. of Educ., 774 F.2d 629, 636 (4th Cir.1985)). Clearly, Congress did not intend that a school system could discharge its duty under the Act by providing a program that produces some minimal educational benefit, no matter how trivial.
 
 
 60
 Furthermore, the Act requires the district court to hear additional evidence when requested by a party. 20 U.S.C.A. § 1415(e)(2). This "additional evidence" can include "evidence concerning relevant events occurring subsequent to the administrative hearing." Town of Burlington, 736 F.2d at 790. Experts may bring the court up to date on the child's progress since the time of the hearing. Id.; see Geis v. Board of Educ., 589 F.Supp. 269, 271 (D.N.J.1984), aff'd, 774 F.2d 575 (3d Cir.1985) (district courts have sometimes used other means of informing themselves about the child's continuing progress); see also Roland M. v. Concord Sch. Comm., 910 F.2d 983, 991 n. 4 (1st Cir.1990) (comparative evidence of past and present academic progress has evidentiary value), cert. denied, --- U.S. ----, 111 S.Ct. 1122, 113 L.Ed.2d 230 (1991).
 
 
 61
 The record before us shows that G.F.'s progress was extremely slow during the 1988-89 school year and serious behavioral problems remained after it ended. G.F. made minimal progress in language and social skills. There was testimony that his in-school vocabulary increased from zero to approximately twenty-five words and that his motor skills increased slightly. Nevertheless, of the forty-one goals and objectives set out for G.F. in his IEP for the 1988-89 school year, only one was fully accomplished, while the other forty were carried over as goals for 1989-90.
 
 
 62
 The district court noted that G.F.'s 1989-90 progress at State Street, in a behavioral oriented program, "was considerably more dramatic than the previous year." Supra typescript at 1031. Dramatic is the right term. At State Street G.F. accomplished at least forty-two of the fifty goals in his IEP--including goals that had to be carried over from the 1988-89 IEP East Hanover recommended because he had attained only one of them. In addition, his behavioral skills improved immeasurably. Despite the district court's recognition, in reciting the facts of this case, that G.F. had made remarkable progress at State Street in 1989-90, it did not discuss this progress in concluding that the 1989-90 IEP was appropriate. This indicates to me that it did not seriously consider the comparative results of the two programs in analyzing G.F.'s substantive claim that the education East Hanover offered him in 1989-90 was not appropriate to his individual needs.
 
 
 63
 The district court made a threshold determination that the substantive inquiry is not whether State Street was better for G.F., but whether the state's offer to place G.F. in East Hanover's program during 1989-90 was appropriate. Supra typescript at 1034. I fail to see how the two can be separated. The district court and now this Court state: "In reviewing the record as to ... East Hanover's educational plan ... for the years 1989 and 1990, each year must be examined independently to determine if the IDEA's procedural and substantive requirements were met." Id. at 1031. I believe that the manner in which a child responds to two different educational methods is material in deciding which method is "appropriate" to his needs. Accordingly, I think the district court erred in treating as immaterial any comparison between the progress that G.F. attained at State Street in 1989-90 and his minimal gains at East Hanover in 1988-89.[1]
 
 
 64
 The district court furthermore stated that its determination was based on the record of the administrative proceedings because the parties had not asked it to consider additional evidence. Id. at 1034 n. 3. The record of the administrative proceedings, however, already contained the evidence showing G.F.'s progress at State Street during the 1989-90 school year.
 
 
 65
 Before trial, the magistrate judge had issued an order in the 1989-90 case expressly allowing the parties to supplement the record with evidence of what took place after the state hearing officer rendered his decision in the fall of 1989. Before counsel had the opportunity to incorporate this material into the record, it became unnecessary to do so because the 1990-91 state administrative proceeding had concluded and the district court was going to consider the parents' claim for both years in one consolidated proceeding. Thus, the record from the 1990-91 state proceeding, including G.F.'s subsequent experiences at State Street, was before the district court when it decided against G.F.'s parents on both the 1989-90 and the 1990-91 school years. Under these circumstances, I am unwilling to rest on the fact that the district court was not formally asked to consider, as "additional" evidence on the 1989-90 claim, evidence already present in the record.
 
 
 66
 Accordingly, I believe the district court failed to give real consideration to the evidence of G.F.'s progress at State Street during the 1989-90 school year before determining that the placement East Hanover offered and the IEP it proposed for 1989-90 promised an appropriate education for G.F. See, e.g., Roland M., 910 F.2d at 991 n. 4; Town of Burlington, 736 F.2d at 791. As discussed, infra, if the district court had considered that evidence, it could not have concluded that any educational benefit G.F. would have received in 1989-90 was other than trivial.
 
 III.
 
 67
 The Court's holding that East Hanover's 1989-90 IEP was appropriate for G.F.'s educational needs is explained in Part V.A. of the district court opinion, an opinion which the Court has adopted as its own. See supra typescript at 1034. There the district court set out its rationale for holding that the educational program and placement East Hanover offered G.F. for the 1989-90 school year, over his parents' objection, were individually appropriate to his needs. That conclusion, now endorsed by this Court, seems to me based largely, if not entirely, on the opinion of the experts who testified in the state administrative proceedings. These experts, in assessing the problems inherent in educating children who suffer from severe learning disabilities, testified that continuation of the program in which G.F. had been placed during 1988-89 was appropriate for him in 1989-90.[2] Moreover, after G.F.'s 1989-90 progress in the State Street behavioral program became known, some of the experts changed their opinion and testified they now believed that G.F. was autistic and would be better served in a behavioral program. In addition, for 1990-91 East Hanover no longer proposed to place G.F. in the non-behaviorally based program it had proposed for 1988-89 and 1989-90. Accordingly, the state education authorities decided that a new behaviorally-oriented program known as the Morris Union Jointure Program that East Hanover planned to begin offering in 1990-91 was appropriate for G.F. in that year, a conclusion with which the district court, this Court and I all agree.
 
 
 68
 Ordinarily, the district court's reliance on expert testimony given in state administrative proceedings would present no problem. The law's search for truth is ever difficult, and nowhere more difficult perhaps than in forecasting how a child will respond to those who seek to guide him in the way he should be trained to go. Cases under the IDEA, by their very nature, must be decided here and now. If only expert predictions are available, there is no choice but to rely on them. When we are, however, able to test the experts' predictions against the reality of the occurrence, we accept the prediction and ignore the reality at the peril of reaching an unjust result. I do not think the district court gives expert testimony in a state administrative proceeding proper weight when it ignores evidence of what actually happened to the child after the proceeding concluded.[3] Of course, evidence of how things turn out is not always dispositive on the issue of what is appropriate for a particular child, but it seems to me that it is assuredly material. It sheds light on the capabilities of the child and unveils the potential that once hid in the future.[4]
 
 
 69
 In the 1988-89 program, G.F. met only one of forty-one IEP goals. The next year, in the State Street program in which his parents enrolled him, G.F. met approximately forty-two of his fifty goals. When this evidence is considered, I am not satisfied that the 1989-90 program East Hanover offered G.F. conferred "some educational benefit" on him. If it did not confer "some" benefit, it failed to meet the standards set by the IDEA, as interpreted by the United States Supreme Court in Rowley, 458 U.S. at 200, 203, 206-07, 102 S.Ct. at 3047, 3049, 3050-51. I also think the Court's holding that East Hanover's 1989-90 IEP was likely to offer G.F. "some" educational benefit incorrectly equates "some" with "any." The two are not synonymous in English,[5] and I am therefore reluctant to conclude that the Supreme Court used the word "some" in such an all-embracing way. I would not read the Act to permit public education to satisfy its obligation to provide "some" educational benefit by an offer of the trivial "any."[6]
 
 
 70
 For these reasons, I fear that the district court's failure to consider the evidence of comparative benefit present in this record in analyzing what "individual" education plan was "appropriate" for G.F. cannot be squared with the requirement in the Act and the regulations that an educational plan be tailored to the unique needs of a particular child. An IEP is, after all, an "individualized education program." In concentrating on what minimal benefit satisfies the standard of "some educational benefit" the Supreme Court teaches us to apply, I think the district court loses sight of the words that give meaning to the colorless acronym IEP. "One size fits all" is not a good slogan for education of the handicapped, and trivial educational advancement is insufficient to satisfy the requirements of the Act. See Diamond, 808 F.2d at 991.
 
 IV.
 
 71
 In conclusion, I think the district court's determination that East Hanover's 1989-90 proposal for G.F.'s placement was appropriate because it offered some educational benefit is incorrect. Events have shown that G.F. would have received no more than a trivial or de minimis educational benefit under East Hanover's proposed program for 1989-90. See id. Thus, the district court erred in determining that the substantive requirements of the Act had been met. What happened to G.F. in 1989-90 destroys the experts' forecast of what might have been.
 
 
 72
 I would therefore vacate the district court's determination that G.F. received an appropriate education during the 1989-90 school year and remand with instructions to consider the extent to which reimbursement should be awarded to G.F.'s parents for the costs they incurred in placing him at State Street for that term. In all other respects, I would affirm.
 
 
 
 [1]
 References to the six transcript volumes from the 1989 hearing before the Administrative Law Judge will be cited as 89T1:__ through 89T6:__. References to the seven 1990 transcript volumes will be cited as 90T1:__ through 90T7:__. Exhibits from the 1989 hearing will be cited as 89E1 through 89E28, while exhibits from the 1990 hearing will be cited as 90E1 through 90E37
 
 
 [2]
 Carolyn Gallagher, the director of State Street, is not related to Theresa Gallagher, G.F.'s speech therapist at East Hanover
 
 
 [3]
 20 U.S.C. § 1415(e)(2) provides that the district court shall, upon the request of a party, receive any additional evidence relevant to the determination. The parties have not requested that the court consider additional evidence, so the court's determination will be based on the record of the administrative proceedings
 
 
 [4]
 Petitioner argues that Dr. Servello's absence from the August 16, 1990 meeting with the Fuhrmanns constitutes a procedural violation of the IDEA. This argument is legally insupportable. N.J.A.C. § 6:28-2.3(h)(1)(iv) dictates that the IEP meetings must include, among other participants, at least one member of the CST. The record indicates that Cindy Veltri and Grace Sowinski, a special education teacher employed by East Hanover, along with non-CST participants Dr. Hamway and the Fuhrmanns, were present at the August 16, 1990 meeting. 90T2:14. Clearly this satisfies the requirements of the New Jersey regulations
 
 
 [5]
 To the extent that petitioner argues that the procedures set forth in 34 C.F.R. §§ 300.347(a)(2) & 300.348 were violated with respect to the 1990-91 school year, that argument must be rejected. Petitioner suggests that the hearing officer's finding that G.F. was in a private school as the result of a unilateral decision of the Fuhrmanns was incorrect and that, therefore, his dismissal of the procedural challenges under these two code sections was erroneous. See Petitioner's Br. at 43 n. 20, 44 n. 21. Petitioner's arguments fail, quite simply, because neither of these two code sections apply to this case
 Both of these regulations are aimed at ensuring that a public agency that would otherwise be responsible for the education of a handicapped child does not abdicate that responsibility merely because a child is or will be enrolled at a private institution. Section 300.347(a)(2) dictates that before a public agency places a child in a private facility, the agency must initiate a meeting to develop an IEP, and must include in that meeting a representative of the private facility. Because East Hanover did not seek to place G.F. at a private facility for 1990-91, it had no duty to include any private school representative in the IEP development process. Section 300.348 sets forth guidelines for the public agency to follow when a handicapped child is enrolled in a private school and receives special education or related services from the public agency. Here, however, there is no indication that, while enrolled at State Street, G.F. received any services from a public agency. Rather, he was enrolled at State Street in lieu of the services offered by the public agency. Clearly, neither section applies to this case.
 
 
 [6]
 Petitioner argues in his brief that judicial estoppel should operate to prevent East Hanover from arguing its position for the 1989-90 school year. The absurdity of this position is manifest. East Hanover cannot be estopped from making different placement recommendations from year to year based on what it has recommended in the past. The two school years at issue are distinct, and the circumstances, as well as G.F.'s needs, are also distinct. There is no inherent and, certainly, no unfair, inconsistency in the positions asserted by East Hanover
 
 
 [7]
 Petitioner argues that the "stay-put" provision of 20 U.S.C. § 1415(e)(3) operates to create a rebuttable presumption in favor of a handicapped child's current placement. This characterization of § 1415(e)(3) is inaccurate. The statute provides:
 During the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement of such child, or, if applying for initial admission to a public school, shall, with the consent of the parents or guardian, be placed in the public school program until all such proceedings have been completed.
 20 U.S.C. § 1415(e)(3). As the Supreme Court noted in Honig v. Doe, 484 U.S. 305, 324, 108 S.Ct. 592, 604, 98 L.Ed.2d 686 (1988), Congress included this provision to prevent state and local education agencies from unilaterally excluding disabled children from public school classes pendente lite. In other words, a child could not be indefinitely suspended from public school while he or she appealed the agency's suspension or expulsion decision through the administrative and federal channels. In this case, G.F. has remained in his current placement, State Street, for the duration of the litigation. The explicit language of the stay-put provision makes clear that it does not, as petitioner suggests, create a substantive presumption in favor of a child's placement after litigation.
 
 
 [8]
 Although this court's charge is to determine if the placement at Jointure was appropriate, rather than ruling on whether Jointure was "better" than State Street or the "best" option, a comparison to State Street's program is revealing. State Street was clearly not the least restrictive environment for G.F. It is a private school in a converted professional office building located on the main street in Hackensack, New Jersey. 90T3:95-96. The building does not have its own gym, cafeteria, or playground, but the students use the cafeteria and playground across the street. 90T4:120. The doors of the facility lock upon closing and can only be opened by using a combination key pad. 90T4:101. There would be 10 children in G.F.'s class with one certified teacher and four teaching assistants, two of whom were college graduates and the other two of whom were full-time employees going to college at night; data collection to monitor students' progress was performed by all staff members. 90T4:105-11. With its inception in March, 1988, State Street's track record was, at most, two years at the time of G.F.'s placement for the 1990-91 school year. 90T4:115. The program offers no occupational therapist on staff, so that the Fuhrmanns would have to pay for the two sessions per week as recommended in the IEP. 90T4:118-19. Clearly as to all these characteristics, the Jointure program was able to offer more for G.F. than State Street
 
 
 [9]
 It should be noted that although petitioner complains that placement in the Jointure program was inappropriate because it had no established performance record by which it could be judged, State Street had been in operation for only two years in the spring of 1990, and only one year when G.F. was first placed there by his parents in 1989. 90T4:115. In addition, counsel for respondents indicated at oral argument that although the Jointure school in Chatham, New Jersey did not have a "track record" in the summer of 1990, there were other Jointure programs that were more firmly established which could have served as a useful source of information about the Chatham Jointure school
 
 
 [10]
 In fact, the dissent argues that the district court refused to consider evidence of G.F.'s progress at State Street at all. Dissent typescript at 1040-1041. However, Judge Barry's opinion is replete with comparisons between G.F.'s experience at East Hanover and his subsequent work at State Street. Indeed, contrary to the dissent's characterization of the district court's opinion, nowhere does Judge Barry suggest that G.F.'s progress at State Street was not considered in her determination that G.F.'s 1989-90 IEP was appropriate
 
 
 [1]
 The Fuhrmanns assert that under 20 U.S.C.A. § 1415(e)(2) the district court must make an "independent review" of the appropriateness of G.F.'s placement. The Fuhrmanns contend that in so doing, "the court may consider evidence which the administrative tribunal did not have before it concerning relevant events occurring subsequent to the administrative hearing." (Appellants Br. at p. 1.)
 Section 1415 of Title 20 provides that "In any action brought under this paragraph the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court deems is appropriate." Thus, while it is true that 20 U.S.C.A. § 1415(e)(2) permits the court to hear "additional evidence" and to make an independent review of the appropriateness of the placement the trial court must be careful not to allow such evidence to change the character of the hearing from one of review (in which the court must give due weight to the administrative proceedings which have taken place) to a trial de novo. Town of Burlington v. Dept. of Educ., Com. of Mass., 736 F.2d 773, 791 (1st Cir.1984), aff'd, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985).
 
 
 [1]
 In footnote 10, the Court infers the district court's consideration of this comparison from the references the district court made to it in its opinion. I have already noted the district court's recognition of G.F.'s progress at State Street in its statement of facts. Its threshold determination that it is not concerned with G.F.'s progress at State Street in its substantive analysis and its failure to utilize that evidence in any meaningful way in the portion of its opinion devoted to legal analysis demonstrates to me that it did not consider, but merely mentioned, these facts
 
 
 [2]
 The administrative hearing with respect to the 1989-90 claims was held between July 17 and September 7, 1989. Therefore, the experts, as well as the administrative law judge, did not have the opportunity to consider G.F.'s progress at State Street during the 1989-90 school year
 
 
 [3]
 Of course, I recognize that this Court has no authority to find facts contrary to those found by either the state ALJ or the district court. I do contend that the district court has power to make an independent determination of the facts and that the identification of those facts that are material to its application of the legal standard for an individually appropriate educational plan is a question of law
 
 
 [4]
 Furthermore, in the instant case, although the expert testimony is conflicting, there was expert testimony before the administrative law judge that G.F. was within the spectrum of autism and that a behavioral-oriented program such as State Street would be appropriate
 
 
 [5]
 According to the Oxford English Dictionary, "some" means a "certain (unspecified) amount, part, degree, or extent of (something), freq. implying 'not little, considerable.' " The Compact Edition of the Oxford English Dictionary Vol. II, at 2915 (1981). On the other hand, "any" means "of whatever quantity[,]" "however great or small." Id. Vol. I, at 95
 
 
 [6]
 Comparison between G.F.'s progress at East Hanover and State Street is possible only because G.F.'s parents had the monetary resources needed, and were willing to risk them, to back up their conviction that East Hanover's 1989-90 program was not appropriate for G.F. Though their own child's progress proves the prize was worth the gamble, there are other children whose individual capabilities may never be realized because they do not have the good fortune of G.F